**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN IMMIGRATION COUNCIL; and TAHIRIH JUSTICE CENTER, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| U.S. CUSTOMS AND BORDER PROTECTION; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

## INTRODUCTION

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking to compel U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and U.S. Department of Homeland Security ("DHS"), to immediately release records relating to the unprecedented transfer of responsibility for conducting asylum screening interviews, known as credible fear interviews, from USCIS—an agency established to carry out immigration benefit adjudications, including asylum claims—to CBP, a law enforcement agency. This transfer of functions, which has occurred outside the public eye, threatens to undermine the asylum screening process that Congress enacted to ensure that noncitizens seeking asylum are not summarily removed to countries where they risk persecution, torture, or even death.

2.      A credible fear interview ("CFI") is a threshold screening in the asylum process conducted by an "asylum officer," and constitutes an essential backstop against summary deportation for those who fear persecution or torture in their country of removal. *See* 8 U.S.C. §

1225(b)(1)(A)(ii), (B), (E). An individual subject to summary removal, otherwise known as expedited removal, generally is deprived of any opportunity to appear before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(A)(i). However, those who receive positive credible fear determinations can pursue asylum in removal proceedings before an immigration judge. *See* 8 C.F.R. § 208.30(f). All other individuals subject to expedited removal are deported with extremely limited opportunities for judicial review. *See* 8 U.S.C. § 1225(b)(1)(A)(i).

3.     Since 2002, USCIS, the agency tasked with adjudication of asylum claims, has employed, housed, and trained the asylum officers who conduct CFIs. CBP, "one of the world's largest law enforcement organizations,"[1] has played the limited role of referring asylum seekers it arrests to an asylum officer for a CFI, as required by statute. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). This separation of adjudicative and law enforcement functions is based in law and consistent with the sensitive, nonadversarial, and specialized nature of CFIs.

4.     Independent government commissions, non-governmental organizations, and the media have documented that CBP officers or agents ("CBP officers") routinely fail to fulfill even the limited statutory and regulatory responsibilities they have in the credible fear process. According to these reports, CBP officers regularly fail to refer noncitizens who express a fear to an asylum officer for a CFI and otherwise interfere with or discourage individuals' attempts to seek asylum.[2] Public reports also document the coercive tactics and abusive behavior that CBP

---

[1] U.S. Customs & Border Prot., *About CBP*, https://www.cbp.gov/about [hereinafter *About CBP*] (last modified Sept. 18, 2019).

[2] *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, The Intercept (Aug. 11, 2019, 12:20 PM), https://bit.ly/2Kx6Zir; Human Rights First, *Fact Sheet: Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect Refugees* (Apr. 2019), https://bit.ly/2nwR5vF; Amnesty International, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers* (2017), https://bit.ly/2s12uoD; Guillermo Cantor & Walter Ewing, American Immigration Council, *Still No Action Taken: Complaints Against Border Patrol*

officers regularly employ against asylum seekers and others in their custody.[3]

5.    Despite these documented practices, DHS reportedly has expanded CBP's role in the credible fear screening process. According to media reports, in April 2019, DHS began a pilot program in which USCIS provided some training to approximately 60 CBP officers to conduct CFIs.[4] Those officers are currently performing that task in the field as part of the pilot or test program.[5] Advocates who have observed these interviews report that CFIs conducted by CBP officers are "creating [a] significant strain" on asylum seekers.[6] President Trump's administration reportedly is considering expanding the pilot program with the aim of reducing the number of positive credible fear determinations, based on a conviction that CBP officers will issue more denials than asylum officers employed by USCIS.[7]

6.    This shift in functions marks a dramatic change in the credible fear screening process, and yet DHS has released little public information regarding the transfer of asylum

_Agents Continue to Go Unanswered_ (Aug. 2017), https://bit.ly/2huoQtO; U.S. Comm'n on Int'l Religious Freedom, _Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal_ (2016), https://bit.ly/2uydMQ8.
[3] _See, e.g.,_ Garrett M. Graff, _The Border Patrol Hits a Breaking Point_, Politico (July 15, 2019), https://politi.co/30uecEY; Univ. of Chi. Law School Int'l Human Rights Clinic, et al., _Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection_, 10-15 (May 2018), https://bit.ly/2oe2b8W; Cantor & Ewing, _supra_ note 2, at 1, 8; Sara Campos & Guillermo Cantor, _Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants_, 13-16 (Sept. 2017), https://bit.ly/2mDQ9oW.
[4] _See_ Molly O'Toole, _Border Patrol agents, rather than asylum officers, interviewing families for 'credible fear'_, L.A. Times (Sept. 19, 2019, 5:50 AM), https://lat.ms/2mqC263; Julia Ainsley, _Stephen Miller wants Border Patrol, not asylum officers, to determine migrant asylum claims_, NBC News (July 29, 2019, 7:31 PM), https://nbcnews.to/2YpVQni; Nick Miroff, _U.S. asylum screeners to take more confrontational approach as Trump aims to turn more migrants away at the border_, Wash. Post (May 7, 2019), https://wapo.st/2JzaEe4; Reuters, _U.S. will assign dozens of border agents to migrant asylum interviews_, Reuters.com (May 9, 2019, 6:09 PM), https://reut.rs/2oeZpjN.
[5] _See_ O'Toole, _supra_ note 4; Ainsley, _supra_ note 4.
[6] O'Toole, _supra_ note 4.
[7] Ainsley, _supra_ note 4.

screening duties to CBP officers.[8] Except for a short statement in a congressional briefing, DHS has not publicly addressed why this change was made, how CBP officers are being trained to conduct CFIs, how CBP officers are being supervised and evaluated as they conduct CFIs, where the pilot is being implemented, and whether there are plans to continue or expand it.

7.    In response to the lack of publicly disclosed information, Plaintiff American Immigration Council submitted a FOIA Request to DHS, USCIS, and CBP (collectively, "Defendants") on May 20, 2019 seeking records related to the transfer of duties in the credible fear screening process that either have been implemented since January 20, 2017 or currently are planned. The Request specifically seeks information that relates to CBP officers conducting interviews and assessing credible fear.

8.    Similarly, on July 5, 2019 and August 2, 2019, Plaintiff Tahirih Justice Center submitted two FOIA Requests to Defendants seeking records relating to CBP officers conducting or potentially conducting CFIs or reasonable fear interviews (RFIs)—a similar threshold screening for fear-based claims for individuals who have prior deportation or administrative removal orders.

9.    Despite the public's urgent need to know about this extraordinary shift in the asylum screening process, Defendants have failed to provide a response within the statutory timeframe mandated by law. As a result, CBP's new role in the credible fear process remains opaque, to the detriment of the public.

---

[8] *See The Trump Administration's Child Separation Policy: Substantiated Allegations of Mistreatment Before the H. Comm. on Oversight & Reform*, 116th Cong. 5 (July 18, 2019) [hereinafter McAleenan Testimony] (testimony of Kevin K. McAleenan, Acting Secretary, U.S. Department of Homeland Security), https://bit.ly/2od7lSE; Reuters, *supra* note 4.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B), (a)(6)(C)(i), (a)(6)(E)(iii) and 28 U.S.C. § 1331.

11.     This Court has jurisdiction to grant declaratory and further proper relief pursuant to 5 U.S.C. §552(a)(4)(B), 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

12.     Venue lies in this District under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

13.     Plaintiff American Immigration Council ("the Council") is a tax-exempt, not-for-profit educational and charitable organization. Founded in 1987, the Council works to strengthen America by shaping public opinion about and conduct towards immigrants and immigration, by working toward a more fair and just immigration system that opens its doors to those in need of protection and by providing information and data to the public regarding federal immigration agencies' operations and activities. Through its research and analysis, the Council has become a leading resource for media and policymakers at the national, state, and local levels who seek to understand U.S. immigration law and policy and to develop policies that are based on facts rather than myths. The Council also seeks, through court action and other measures, to hold the government accountable for unlawful conduct, restrictive interpretations of the law, withholding of information, and for failing to implement and execute immigration laws in a manner that comports with due process.

14.     Plaintiff Tahirih Justice Center ("Tahirih") is the largest multi-city direct services and policy advocacy organization specializing in assisting immigrant women and girls who survive gender-based violence.  In five cities across the country, Tahirih offers legal and social services to

5

women and girls fleeing all forms of gender-based violence, including human trafficking, forced labor, domestic violence, rape and sexual assault, and female genital cutting/mutilation. Since its beginning in 1997, Tahirih has provided free legal assistance to more than 25,000 individuals, many of whom have experienced the significant psychological and neurobiological effects of that trauma. Through direct legal and social services, policy advocacy, and training and education, Tahirih protects immigrant women and girls and promotes a world where they can live in safety and dignity.

15. Defendant DHS is an agency of the United States government and an agency within the meaning of 5 U.S.C. § 552(f). DHS is responsible for administering and enforcing immigration laws. DHS is comprised of multiple component agencies, including USCIS and CBP.

16. Defendant CBP is a component agency of DHS and an agency within the meaning of 5 U.S.C. § 552(f). CBP's mission is to "safeguard America's borders." [9]  In the past year, a number of CBP officers began conducting CFIs and making credible fear determinations.

17. Defendant USCIS is a component agency of DHS and an agency within the meaning of 5 U.S.C. § 552(f). Upon information and belief, USCIS is responsible for training and/or supervising CBP officers conducting CFIs and making credible fear determinations.

18. Upon information and belief, Defendants have custody and control over the records Plaintiffs seek to make publicly available under 5 U.S.C. § 552(a)(2).

## STATEMENT OF FACTS

***Expedited Removal and the Credible Fear Screening Process***

19. Congress has authorized immigration officers to remove "without further hearing or review" certain noncitizens who arrive at a port of entry or enter the United States without

---

[9] *About CBP*, *supra* note 1.

inspection.[10] 8 U.S.C. § 1225(b)(1)(A)(i), (iii). However, Congress included an important procedural safeguard for individuals who express a fear of persecution in their country of removal or declare an intent to seek asylum.

20.    A CBP officer must refer a person who expresses a fear of return or an intent to seek asylum to an "asylum officer," for a determination regarding whether the individual has a "credible fear" of persecution; namely, whether "there is a significant possibility . . . that the [noncitizen] could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(iii)(I), (B)(v). Congress intended this threshold credible fear determination "to be a low screening standard for admission into the usual full asylum process." 142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch).

21.    In the credible fear review process, asylum officers also screen for  claims for protection in the form of withholding of removal and protection under the Convention Against Torture (CAT). *See* 8 C.F.R. § 208.30(e)(2), (e)(3). This is in keeping with the United States' long-standing commitment to protecting those who flee persecution.[11]

---

[10] Until recently, noncitizens who entered the United States without inspection were subject to expedited removal only if DHS apprehended them within fourteen days of entry and within 100 miles of a land border. *See* Designating Aliens For Expedited Removal, 69 Fed. Reg. 48,877, 48,880-81 (Aug. 11, 2004). On July 23, 2019, DHS announced that it would immediately expand expedited removal to encompass noncitizens who enter without inspection and are apprehended anywhere in the United States if they cannot prove "to the satisfaction of an immigration officer" that they entered at least two years prior. Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,413-414 (July 23, 2019). *But see Make the Road New York v. McAleenan*, No. 19-cv-2369 (KBJ), 2019 WL 4738070, *49 (D.D.C. Sept. 27, 2019) (preliminarily enjoining this expansion).

[11] *See* Protocol Relating to the Status of Refugees,  Jan. 31, 1967, 606 U.N.T.S. 267,  https://bit.ly/2F5QqXD; Refugee Act of 1980, Pub. L. No. 96-212 § 101(a), 94 Stat. 102, 102 (Mar. 17, 1980); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2822 (Oct. 21, 1998).

22.     If the asylum officer determines that the noncitizen has established a credible fear of persecution, the officer must refer the noncitizen for a removal proceeding under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). In a removal proceeding, the noncitizen can apply for relief or protection from removal before an immigration judge. *See* 8 U.S.C. § 1229a(c)(4). Importantly, removal proceedings before an immigration judge include key statutory due process rights. 8 U.S.C. § 1229a(b)(4).

23.     If, after review by a supervisory asylum officer, *see* 8 C.F.R. § 208.30(e)(7), the asylum seeker is found not to have established a credible fear of persecution, the noncitizen may seek review of that decision by an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1208.30(g). If the noncitizen does not seek review by an immigration judge, the asylum officer must order removal.

24.     An immigration judge, upon *de novo* review of the record of the negative credible fear determination, the asylum officer's notes, and any evidence submitted by the noncitizen, may affirm or reverse the asylum officer's credible fear determination. 8 C.F.R. § 1208.30(g)(2). Once an immigration judge affirms a negative credible fear determination, that decision may not be appealed, and the noncitizen can be deported swiftly. *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 1208.30(g)(2)(iv)(A).

25.     In addition to the crucial due process rights at stake in this process, credible fear screenings are inherently sensitive. People fleeing persecution often must recount painful details of past harm, including sexual and physical violence, and other harrowing incidents. Fear, trauma, language and cultural barriers, lack of understanding about the process and purpose of the CFI, and mental illness can interfere with the person's ability to communicate his or her fear-based claims. Consistent with the sensitive nature of these interviews, regulations require that the CFI be

conducted in a "nonadversarial manner, separate and apart from the general public" so that the asylum officer may "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

26.    The asylum officers who conduct CFIs must receive the equivalent of "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 C.F.R. § 208.1(b); *see* 8 U.S.C. § 1225(b)(1)(E)(i) (requiring asylum officers to have received "professional training . . . comparable to that provided to full-time adjudicators" of asylum applications). In addition, asylum officers must be supervised by officers with "substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E)(ii).

### The Role of USCIS Asylum Officers in the Credible Fear Review Process

27.    Congress established USCIS in 2002 to perform all immigration adjudications, including those relating to asylum claims. *See* 6 U.S.C. § 271(b)(3), (5).[12] USCIS houses and trains its asylum officers, who are hired specifically to evaluate fear-based claims, in the Asylum Division within its Refugee, Asylum and International Operations Directorate ("RAIO").[13] For almost two decades, USCIS' highly trained corps of asylum officers have been solely responsible for conducting CFIs and making credible fear determinations. *See* 8 C.F.R. § 208.2(a).

---

[12] With the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107–296, 116 Stat. 2135, 2192, 2193, 2196, 2205 (Nov. 25, 2002), Congress eliminated the former Immigration and Naturalization Service and transferred its adjudicative functions to what is now USCIS (initially named the Bureau of Citizenship and Immigration Services) and its law enforcement functions to what are now are now CBP and Immigration and Customs Enforcement. *See* 6 U.S.C. §§ 251, 252(a)(3), 271(b), 291.

[13] U.S. Citizenship & Immigration Servs., Refugee, Asylum, and International Operations Directorate, *Organization*, https://bit.ly/2mHoun4 (last reviewed/updated Aug. 11, 2017); U.S. Citizenship & Immigration Servs., Asylum Division Training Programs, https://bit.ly/2mH9F3R [hereinafter Asylum Division Training Programs] (last reviewed/updated Dec. 19, 2016).

28.    Asylum officers must attend and complete the Asylum Officer Basic Training Course ("AOBTC"), "a national training course that is specific to asylum adjudications" with instructors from within the Asylum Division "as well as non-governmental organizations, law schools, and the [United Nations High Commission on Refugees]."[14] As part of their ongoing education, asylum officers are provided weekly training sessions of up to four hours.[15]

***USCIS and Reasonable Fear Interviews***

29.    Reasonable fear interviews (RFIs) are part of a threshold screening process for withholding of removal and CAT for individuals who are subject to reinstatement of a prior removal order under 8 U.S.C. § 1231(a)(5) or administrative removal under 8 U.S.C. § 1228(b). *See* 8 C.F.R. §§ 208.31, 238.1(f)(3), 241.8(e). A noncitizen in an RFI must meet a higher standard than the credible fear standard. 8 C.F.R. § 208.31(c). USCIS asylum officers have exclusive jurisdiction over reasonable fear determinations. 8 C.F.R. § 208.31(a), (d). With some exceptions not relevant here, the RFI process otherwise tracks the CFI process procedurally. *See* 8 C.F.R. § 208.31(c), (e)-(g).

30.    Defendants have not released any public information regarding whether CBP officers are being trained for, or are in fact conducting, RFIs.

***CBP's Law Enforcement Role and History of Mistreatment of Asylum Seekers***

31.    CBP "is one of the world's largest law enforcement organizations and is charged with keeping terrorists and their weapons out of the [United States] while facilitating lawful international travel and trade."[16]

---

[14] *Id.*
[15] *Id.*
[16] *About CBP*, *supra* note 1.

32.     Consistent with their law enforcement role, CBP officers historically have had limited responsibilities in the credible fear screening process. They are required to read a script to all individuals facing expedited removal which informs these individuals of their right to speak to an asylum officer if they have a fear of return; additionally, they must refer those who express a fear or an intent to apply for asylum to a USCIS asylum officer for a CFI. *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(2)(i), (b)(4). Similarly, CBP officers are required to refer individuals subject to reinstatement of removal or administrative removal who express a fear to an asylum officer for an RFI. *See* 8 C.F.R. §§ 238.1(f)(3), 241.8(e).

33.     CBP and its officers and agents have a long and well-documented history of misconduct towards asylum seekers, including failing to comply with their limited statutory and regulatory duties in the credible fear screening process. Reports indicate that CBP officers routinely fail to refer those who express a fear or an intent to seek asylum for a CFI, do not read the required advisals to the individual, coerce or threaten asylum seekers to recant their expressed fear, and record false information about asylum seekers in CBP paperwork.[17]

34.     A 2016 study commissioned by Congress "revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed U.S. Border Patrol[18] internal guidance that conflates CBP's role with that of USCIS;

---

[17] *See, e.g.*, Washington, *supra* note 2; Human Rights First, *supra* note 2; Amnesty International, *supra* note 2; Amnesty International, *'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States*, 17 (2018), http://bit.ly/2opsede; Cantor & Ewing, *supra* note 2; B. Shaw Drake et al., Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (2017), http://bit.ly/2pb69jd; U.S. Comm'n on Int'l Religious Freedom, *supra* note 2.
[18] U.S. Border Patrol is a component of CBP. *See* U.S. Customs & Border Prot., *Leadership/Organization*, https://www.cbp.gov/about/leadership-organization (last modified July 24, 2019).

certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures."[19]

35.      In addition, journalists and non-governmental organizations have reported that CBP officers have a high incidence of physical and verbal abuse of asylum seekers and others in their custody.[20] For example, in July 2019, media reported that thousands of CBP officers were members of a Facebook group in which CBP officers mocked a father and his toddler who drowned while attempting to enter the United States and otherwise used derogatory, racially charged language about migrants.[21] In the same month, journalists reported that CBP officers forced a noncitizen to hold a sign identifying himself as a homosexual,[22] detained children in "poor conditions that are not pure byproducts of overcrowding,"[23] sexually assaulted a child in CBP custody, and retaliated against other children for protesting the conditions of their confinement.[24]

---

[19] U.S. Comm'n on Int'l Religious Freedom, *supra* note 2, at 2.

[20] *See, e.g.*, Graff, *supra* note 3; Vanessa Romo, *U.S. Border Agents Seen on Video Trying to Deport a Man Who 'Looks Mexican'*, NPR (Apr. 12, 2018, 5:29 PM), https://n.pr/2mH1HrD; Univ. of Chi. Law School Int' Human Rights Clinic, *supra* note 3; Cantor & Ewing, *supra* note 2, at 1, 8; Campos & Cantor, *supra* note 3, at 13-16; Jesuit Conf. of Canada & U.S., *Our Values on the Line: Migrant Abuse and Family Separation at the Border*, 6-10 (Sept. 2015), http://bit.ly/2oYdkuT; ACLU of Arizona, *Record of Abuse: Lawlessness and Impunity in Border Patrol's Interior Enforcement Operations*, 6 (Oct. 2015), http://bit.ly/2od9EVZ; The Ctr. for Latin American Studies, Univ. of Ariz., *In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security*, 24 (Mar. 2013), http://bit.ly/2oca0Mp; Daniel E. Martínez, et al., American Immigration Council, *Bordering on Criminal: The Routine Abuse of Migrants in the Removal System*, 6 (Dec. 2013), http://bit.ly/2nAvtyv.

[21] A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019, 10:55 AM), https://bit.ly/2YyJXfu.

[22] Nick Valencia et al., *Border Patrol agents allegedly tried to shame a migrant by making him hold a sign reading 'I like men,' emails show*, CNN (July 4, 2019, 4:58 PM), https://cnn.it/2mPKOes.

[23] Jacob Soboroff & Julia Ainsley, *Migrant kids in overcrowded Arizona border station allege sex assault, retaliation from U.S. agents*, NBC News (July 9, 2019, 8:30 PM), https://nbcnews.to/2LbfbGP; *see* Simon Romero et al., *Hungry, Scared and Sick: Inside the Migrant Detention Center in Clint, Tex.*, N.Y. Times (July 9, 2019), https://nyti.ms/2L7dREA.

[24] *See* Soboroff & Ainsley, *supra* note 22.

*DHS Instructs CBP to Conduct Credible Fear Interviews*

36.    Against this backdrop, in a memorandum published on April 29, 2019, President Trump directed the Secretary of DHS to "reprioritize the assignment of immigration officers . . . as the Secretary deems necessary and appropriate to improve the integrity of adjudications of credible and reasonable fear claims . . . ."[25] Subsequent media reports indicate that beginning in April 2019, in a program intended to be a pilot, USCIS provided training for approximately 60 CBP officers to conduct CFIs and those officers are currently conducting interviews in the field.[26] Reports further indicate that the Trump Administration has requested $23 million from Congress to fund the pilot and hopes to expand the program.[27]

37.    DHS' decision to take CBP officers away from their law enforcement responsibilities in order to conduct CFIs contradicts the agency's recent claims that there is a law enforcement "crisis" at the United States-Mexico border. DHS has stated that CBP requires additional enforcement resources to respond to a purported "emergency" at the border, but at the same time has removed CBP officers from border law enforcement duties to carry out asylum adjudicative functions, leaving the public with questions about the agency's justification for its decision-making and heightening the need for information.

38.    Either as part of the initial pilot, or via an expansion, in September 2019 CBP officers reportedly began conducting CFIs for families seeking protection.[28]

---

[25] Donald J. Trump, *Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System* (Apr. 29, 2019), https://bit.ly/2L15KYW.
[26] O'Toole, *supra* note 4; Ainsley, *supra* note 4; Miroff, *supra* note 4.
[27] O'Toole, *Border patrol agents*, *supra*; Ainsley, *Stephen Miller*, *supra*; Miroff, *U.S. asylum screeners*, *supra;* Geneva Sands et al., *White House backs Stephen Miller proposal to let Border Patrol agents to conduct asylum interviews*, CNN (May 8, 2019), https://cnn.it/2ntS5AZ .
[28] O'Toole, *supra* note 4.

39.    DHS has taken these steps notwithstanding CBP's law enforcement role and history of animus towards asylum seekers. In fact, media reports indicate that CBP officers have been selected to conduct CFIs precisely because they are likely to obstruct—and deport—asylum seekers by issuing more negative credible fear determinations.[29]

40.    The special representative for the asylum officers' federal union has publicly expressed concern that CBP officers, because of their law enforcement background, are not well-suited for the responsibility of screening asylum seekers.[30]

41.    Early results from the pilot program suggest that CBP officers are meeting this obstructionist goal. According to media sources, as of August 2019, CBP officers "had completed 178 credible-fear screenings with asylum seekers from more than 15 countries—all of whom were single adults. They determined 54% met the credible-fear standard and 35% did not. [CBP officers] closed 11% of cases without making a determination."[31] This marks a dramatic drop from the roughly 80% approval rate when CFIs are conducted by asylum officers employed by USCIS—a rate consistent with the generous credible fear standard.[32]

42.    Through this transfer of functions, DHS has replaced asylum officers who are hired and trained to adjudicate sensitive claims for asylum with law enforcement officers hired to combat terrorism from an agency with a history of mistreating asylum seekers and obstructing their due process rights. Despite the significance of this change to the credible fear process, there is little or no public information about this transfer of functions. The only information DHS has made

---

[29] Ainsley, *supra* note 4.

[30] O'Toole, *supra* note 4.

[31] O'Toole, *Border Patrol agents*, *supra.*

[32] *Id.*

available to the public has been through testimony to committees of the U.S. House of Representatives, which lacked any significant detail.[33]

43.    Upon information and belief, there are no publicly available records regarding the pilot program in which CBP officers conduct CFIs or any plans to expand it. Timely, public information regarding this dramatic shift in functions is crucial, given the current, robust national conversation and interest regarding the U.S. asylum process, the treatment of asylum seekers, and what DHS has claimed to be a law enforcement crisis at the southern border.

***Plaintiff American Immigration Council's FOIA Request and Defendants' Response***

44.    In order to shed light on changes to the credible fear process and the role of CBP, Plaintiff American Immigration Council submitted a FOIA Request ("Council Request") to DHS, CBP, and USCIS on May 20, 2019. *See* Exhibit A.

45.    The Council Request sought records regarding changes to the credible fear process that either have been implemented since January 20, 2017 or are currently planned and that relate to CBP officers or agents conducting interviews and making determinations regarding credible fear under 8 U.S.C. § 1225(b)(1)(B), including records describing, referring, or relating to:

    a.    Consideration of or decisions about whether CBP officers are to be authorized to conduct CFIs.

    b.    Policies, procedures, recommendations, guidelines or memorandum of agreement relating to CBP officers conducting CFIs, including any changes to pre-existing policies, procedures, recommendations, guidelines or memorandum of agreement related to CFIs.

---

[33] McAleenan Testimony, *supra* note 8; Reuters, *supra* note 4.

c.  Training materials developed, used or intended to be used to train CBP officers to conduct CFIs, including but not limited to lesson plans and Power Point presentations, and any memoranda implementing such trainings.

d.  Protocols and/or policies for evaluating whether a CBP officer will be authorized to conduct CFIs, including but not limited to any tests or other evaluative materials relating to the agent or officer's knowledge acquired from training, and/or the performance of CBP officers while conducting mock or actual CFIs.

e.  Supervision of CBP officers who are authorized to conduct CFIs, including but not limited to which DHS component (USCIS or CBP) and officials within that component will be responsible for carrying out the supervision and the manner in which the supervision will be conducted.

f.  The respective roles of USCIS and CBP with respect to CBP officers who are authorized to conduct CFIs, including but not limited to training, supervision, review of credible fear determinations, and monitoring for quality assurance and compliance with the law, regulations and agency policies.

g.  Any concerns, whether practical, legal, or otherwise, that would weigh against giving CBP officers authority to conduct CFIs.

h.  Communications, whether electronic or conventional, within or among, DHS, CBP, USCIS, or any of their agents, agencies, subagencies, or offices, relating to CBP officers conducting CFIs, including but not limited to (a) all communications regarding the planning and/or implementation of any proposal for CBP officers to conduct CFIs and (b) all communications regarding the training, evaluation, and supervision of CBP officers with respect to CFIs.

i.   Communications, whether electronic or conventional, between DHS, CBP, USCIS, or any of their agents, agencies, subagencies, or offices, and President Trump's Administration, including the Executive Office of the President, and/or staff working from the White House, relating to CBP officers conducting CFIs, including but not limited to: (a) all communications regarding consideration of or decisions about whether CBP officers are to be authorized to conduct CFIs; (b) all communications regarding the planning and/or implementation of any proposal for CBP officers to conduct CFIs; and (c) all communications regarding the training, evaluation, and supervision of CBP officers with respect to CFIs.

j.   DHS' May 1, 2019 supplemental budget request to the U.S. House of Representatives, titled Southern Border Humanitarian Crisis Supplemental Request, requesting, inter alia, "$23M to begin implementing the Border Patrol credible fear screening program," including any and all records relating to this request.

Exhibit A at 2-3.

46.    The Council Request further sought expedited processing by each Defendant "because there is 'an urgency to inform the public about an actual or alleged federal government activity' by organizations 'primarily engaged in disseminating information'" under 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). Exhibit A at 4-5 (quoting 6 C.F.R. § 5.5(e)(1)(ii)). The Council Request explained that asylum seekers and their attorneys have an urgent need to know how any transfer of functions from USCIS to CBP will impact the evaluation of their asylum claims and the general public has an urgent need to understand plans to divert officers from law enforcement

to non-law enforcement roles. *Id.* Finally, the Council Request sought from each Defendant a waiver of fees relating to processing the request.

47.    On May 20, 2019, shortly after submitting the Request, Plaintiff American Immigration Council received an e-mail reply from USCIS, Exhibit B, and an e-mail delivery confirmation receipt from DHS, Exhibit C.

48.    In a letter dated May 21, 2019, CBP acknowledged receipt of the Request. *See* Exhibit D. In that letter, CBP stated that while its "goal is to respond within 20 business days of receipt of [the Council] Request, FOIA does permit a 10-day extension of this time period in certain circumstances." *Id.* Defendant CBP did not expressly invoke the ten-day extension. *Id.* The letter further explained that "the average time to process a FOIA request related to 'travel/border incidents' is a minimum of 3-6 months." *Id.* The notice also assigned tracking number CBP-2019-053918 to the Council Request. *Id.*

49.    Also on May 21, 2019, Plaintiff American Immigration Council received three e-mail notifications from CBP (1) granting Plaintiff American Immigration Council's request to expedite the processing, Exhibit E, (2) granting Plaintiff American Immigration Council's request to waive all processing fees, Exhibit F, and (3) changing the tracking number for the Request to CBP-OC-2019-053918, Exhibit G.

50.    On June 16, 2019, Plaintiff American Immigration Council received another e-mail notification from CBP stating that it again had changed the tracking number for the Request, to CBP-2019-053918. Exhibit H.

51.    Defendants have failed to provide any substantive response to the Council Request. To the contrary, after initial receipt notices and communications regarding FOIA tracking

numbers, none of the Defendants have communicated further with Plaintiff American Immigration Council or produced any information in response to the Council Request.

52.     Plaintiff American Immigration Council has demonstrated a compelling need for the information requested.

53.     Plaintiff American Immigration Council is an organization primarily engaged in disseminating information.

54.      Defendants DHS and USCIS failed to respond to Plaintiff American Immigration Council's request to expedite processing and to process the Council Request as soon as practicable under 5 U.S.C. § 552(a)(6)(E).

55.     Defendant CBP failed to process the Council Request as soon as practicable after granting Plaintiff American Immigration Council expedited processing. 5 U.S.C. § 552(a)(6)(E)(iii).

56.     In the alternative, Defendants have violated the applicable statutory time limit for processing of FOIA requests. Under 5 U.S.C. § 552(a)(6)(A), Defendants were required to make a determination on the Council Request within twenty business days.

57.     Defendants failed to request an additional ten business days under 5 U.S.C. § 552(a)(6)(B) and in any event have also failed to make a determination within thirty business days.

58.     Defendants have failed to conduct an adequate search and have unlawfully withheld responsive records.

59.     Because Defendants have failed to respond to the Council Request within the applicable statutory period, any administrative remedies are deemed exhausted. 5 U.S.C. § 552(a)(6)(C)(i).

60. Plaintiff American Immigration Council has been irreparably harmed by Defendants' failure to timely respond to the Council Request.

***Plaintiff Tahirih Justice Center's FOIA Requests and Defendants' Response***

61. To promote greater transparency regarding the apparent new pilot program to train and deploy CBP agents to conduct CFIs and or RFIs for asylum seekers, Plaintiff Tahirih Justice Center submitted a FOIA Request dated July 5, 2019 ("Tahirih Request") to DHS, CBP, and USCIS. *See* Exhibit I.

62. The Tahirih Request sought any and all records that were prepared, received, transmitted, collected and/or maintained by CBP , USCIS , and/or DHS that describe, refer or relate to (1) CBP officers conducting or potentially conducting CFIs or RFIs, (2) any training or proposed training related to CBP officers conducting or potentially conducting CFIs or RFIs, and/or (3) the proposed or actual implementation of (1) or (2) (collectively, the "Program"), including records describing, referring, or relating to:

   a. Any regulations, protocols, memoranda, recommendations, policy directives, policy guidelines, or procedures related to the Program.

   b. Any documents or communications related to the creation, authorization, funding, budgeting, preparation, supervision, and/or implementation of the Program.

   c. Any documents or communications referencing any actual, proposed, or potential goal, target, objective, guideline, procedure, and/or policy of the Program.

   d. Any training materials developed, used, or intended to be used in the Program.

   e. Any evaluation, testing, or screening materials or protocols developed, used, or intended to be used for the Program as part of determining whether or which officers may conduct CFIs or RFIs.

    f.   Any memoranda, recommendations, guidelines, procedures, policies, or directives related to the supervision of the Program and/or of officers involved in the Program.

    g.   Any documents or communications referring to actual or potential administrative, practical, legal, or ethical challenges, concerns, or obstacles the Program may face.

Exhibit I at 2-3. The Tahirih Request also sought from each Defendant a waiver of fees relating to processing the request. *Id.* at 3.

63.    Plaintiff Tahirih Justice Center submitted a Supplemental FOIA Request to DHS, CBP, and USCIS ("Tahirih Supplemental Request") dated August 2, 2019. *See* Exhibit J.

64.    The Tahirih Supplemental Request sought any and all records that were prepared, received, transmitted, collected and/or maintained by CBP, USCIS, and/or DHS relating to the use of CBP officers to conduct CFIs and/or RFIs not covered by the Tahirih Request, including:

    a.   Any records related to the expansion of the pilot program under which CBP officers have conducted CFIs and/or RFIs;

    b.   Any records concerning the date under which the pilot program will be expanded;

    c.   Any written policy directives, written policy guidelines, or written procedures concerning the expansion of the pilot program;

    d.   Any records referring to the location(s) in which CBP officers have conducted, are conducting, or will conduct, CFIs and/or RFIs;

    e.   Any records concerning whether CBP officers have conducted, are conducting, or will conduct, CFIs and/or RFIs in person, by telephone, by video teleconference, or by other means;

    f.   Any records concerning whether CBP officers have conducted, are conducting, or will conduct, CFIs and/or RFIs while wearing CBP uniforms;

g.  Any records concerning whether CBP officers have conducted, are conducting, or will conduct, CFIs and/or RFIs while carrying firearms or other weapons;

h.  Any records concerning the number of CBP officers who were trained, are being trained, or will be trained, to conduct CFIs and/or RFIs;

i.  Any records concerning the positions and job descriptions of the CBP officers who were trained, are being trained, or will be trained to conduct CFIs and/or RFIs;

j.  Any records concerning the numbers of, or percentage of, CFIs in which CBP officers in the pilot program found a credible fear of return versus finding no credible fear of return, including, but not limited to, any records concerning any comparison of those numbers or percentages as between USCIS Asylum Officers and CBP Officers acting as asylum officers; and

k.  Any memoranda or other records dated on or after July 5, 2019, concerning the pilot program under which CBP officers have conducted CFIs and/or RFIs.

Exhibit J at 2-3. The Tahirih Supplemental Request also sought from each Defendant a waiver of fees relating to processing the request. *Id.* at 3-4.

65.    In a letter dated July 10, 2019, Defendant DHS acknowledged receipt of the Tahirih Request, invoked the ten-day extension to respond, and conditionally granted the fee waiver request. *See* Exhibit K. More than ten days have passed since Defendant DHS invoked the ten-day extension, but Plaintiff Tahirih Justice Center has received no further response from DHS. Defendant DHS also provided no response to the Tahirih Supplemental Request.

66.    On July 22, 2019, Plaintiff Tahirih Justice Center received an automatic e-mail response from Defendant CBP confirming receipt of the Tahirih Request. *See* Exhibit L. In a letter dated August 5, 2019, Defendant CBP acknowledged receipt of the Tahirih Supplemental Request.

*See* Exhibit M. In that letter, CBP stated that while its "goal is to respond within 20 business days of receipt of [the Tahirih Supplemental R]equest, FOIA does permit a 10-day extension of this time period in certain circumstances . . . ." *Id.* Defendant CBP did not expressly invoke the ten-day extension. *Id.* In e-mails also dated August 5, 2019, Defendant CBP waived the fees associated with the Tahirih Supplemental Request, *see* Exhibit N, and changed the tracking number for that request from CBP-OFO-2019-069475 to CBP-2019-069475, *see* Exhibit O.

67.    Defendants DHS and CBP have failed to provide any substantive response to the Tahirih Request or Tahirih Supplemental Request. To the contrary, after the initial receipt notices, neither DHS nor CBP have communicated further with Plaintiff Tahirih Justice Center and neither has produced any information in response either request.

68.    In two letters dated August 9, 2019, Defendant USCIS provided responses to Plaintiff Tahirih Justice Center. In one response, assigned the number COW2019500983, Defendant USCIS stated that the documents requested in the Tahirih Request "are not under the purview of USCIS" and stated it was referring that request to CBP. *See* Exhibit P.

69.    In the other response, also dated August 9, 2019 and captioned number COW2019500899, Defendant USCIS stated that it had the Tahirih Supplemental Request, that this request appeared to be a duplicate of the initial Tahirih Request and that it was closing the Tahirih Supplemental Request for this reason. *See* Exhibit Q.

70.    In a letter dated August 20, 2019, Defendant USCIS provided a third response, captioned COW2019500960, in which it explicitly referenced both  the Tahirih Request and the Tahirih Supplemental Request. *See* Exhibit R. Defendant USCIS stated that it was assigning both the Tahirih Request and the Tahirih Supplemental Request to Track 2 (complex request), invoked the ten-day extension to respond and granted Plaintiff Tahirih Justice Center's request for a fee

waiver. Consistent with this subsequent letter, Plaintiff Tahirih Justice Center understands that Defendant USCIS either did not close Tahirih Supplemental Request or reopened it in order to assign it to Track 2. Subsequent to this response, Plaintiff Tahirih Justice Center has received no further responses from Defendant USCIS.

71.     All Defendants have violated the applicable statutory time limit for processing of the Tahirih Request and the Tahirih Supplemental Request. Under 5 U.S.C. § 552(a)(6)(A), Defendant CBP was required—but failed—to make a determination within 20 business days of receipt of each of Tahirih's FOIA requests. Under 5 U.S.C. § 552(a)(6)(A) and (B), Defendant DHS was required—but failed—to make a determination within 30 business days of receipt of the Tahirih Request and within 20 business days of receipt of the Tahirih Supplemental Request. 5 U.S.C. § 552(a)(6)(A), Defendant USCIS was required—but failed—to make a determination within 30 days of receipt of the Tahirih Request and the Tahirih Supplemental Request.

72.     Defendants have failed to conduct an adequate search and have unlawfully withheld responsive records.

73.     Because Defendants have failed to respond to the Tahirih Request and the Tahirih Supplemental Request within the applicable statutory period, any administrative remedies are deemed exhausted. 5 U.S.C. § 552(a)(6)(C)(i).

74.     Plaintiff Tahirih Justice Center has been irreparably harmed by Defendants' failure to timely respond to the Tahirih Request and the Tahirih Supplemental Request.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (All Plaintiffs v. All Defendants)

### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Conduct an Adequate Search for Responsive Records

75.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs.

76.     Defendants are obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Plaintiffs' FOIA Requests. Defendants failed to conduct such a search with respect to any of the three FOIA requests.

77.     Plaintiffs have a legal right to obtain such records, and no legal basis exists for Defendants' failure to search for them.

78.     Defendants' failure to conduct a reasonable search for records responsive to Plaintiffs' Requests violates 5 U.S.C. § 552(a)(3).

### SECOND CAUSE OF ACTION
### (Plaintiff American Immigration Council v. Defendant CBP)

### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Process Request as Soon as Practicable

79.     Plaintiffs incorporates each and every allegation contained in the preceding paragraphs.

80.     Plaintiff American Immigration Council sought expedited treatment from Defendant CBP of its Request pursuant to 5 U.S.C. § 552(a)(6)(E).

81.     Plaintiff American Immigration Council demonstrated a compelling need for expedited processing of the Request, namely, "the urgency to inform the public concerning actual or alleged Federal Government activity."  5 U.S.C. § 552(a)(6)(E)(v)(II).

82.    Defendant CBP granted Plaintiff American Immigration Council's request for expedited processing. Defendant CBP failed to provide records as soon as practicable after granting expedited processing of the Council Request.

83.    Defendant CBP's failure to provide records as soon as practicable after granting Plaintiff American Immigration Council's request for expedited processing violates 5 U.S.C. § 552(a)(6)(E)(iii).

## THIRD CAUSE OF ACTION
### (Plaintiff American Immigration Council v. Defendant CBP)

### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Make a Determination and Produce Responsive Documents (Alternative Claim)

84.    Plaintiffs incorporates each and every allegation contained in the preceding paragraphs.

85.    In the alternative, Defendant CBP is obligated under 5 U.S.C. § 552(a)(6)(A)(i) to make a determination on Plaintiff American Immigration Council' FOIA Request within twenty business days. Defendant CBP did not make a determination within twenty business days of receipt of the Council Request.

86.    Defendant CBP is obligated to produce responsive records promptly under 5 U.S.C. § 552(a)(3)(A)(i). Defendant CBP failed to do so.

87.    Defendant CBP's failure to make a determination within the statutory time frame and produce responsive records promptly violates 5 U.S.C. § 552(a)(3)(A) and (a)(6)(A)(i).

## FOURTH CAUSE OF ACTION

### (Plaintiff American Immigration Council v. Defendants DHS and USCIS)

### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Make a Determination and Produce Responsive Documents

88.    Plaintiffs incorporates each and every allegation contained in the preceding paragraphs.

89.    Defendants DHS and USCIS are obligated under 5 U.S.C. § 552(a)(6)(A)(i) to make a determination on Plaintiff American Immigration Council' FOIA Request within twenty business days. Neither Defendant made a determination within twenty days of receipt of the Council Request.

90.    Defendants DHS and USCIS are obligated to produce responsive records promptly under 5 U.S.C. § 552(a)(3)(A). Both Defendants failed to do so.

91.    Defendants DHS's and USCIS's failure to make a determination within the statutory time frame and to produce responsive records promptly violates 5 U.S.C. § 552(a)(3)(A) and (a)(6)(A)(i)

## FIFTH CAUSE OF ACTION

### (Plaintiff Tahirih Justice Center v. All Defendants)

### Violation of the Freedom of Information Act, 5 U.S.C. § 552:
### Failure to Make a Determination and Produce Responsive Documents

92.    Plaintiffs incorporates each and every allegation contained in the preceding paragraphs.

93.     Defendants are obligated under 5 U.S.C. § 552(a)(6)(A)(i) to make a determination on Plaintiff Tahirih Justice Center's FOIA Requests within twenty business days. Pursuant to 5 U.S.C. § 552(a)(6)(B), Defendants may invoke an additional ten days to respond.

94.     Defendants are obligated to produce responsive records promptly under 5 U.S.C. § 552(a)(3)(A).

95.     None of the Defendants met the statutory time frames for making a determination on the Tahirih Request or the Tahirih Supplemental Request.

96.     Defendant CBP did not invoke 5 U.S.C. § 552(a)(6)(B) with respect to the Tahirih Request and thus was obligated to make a determination on it within 20 business days pursuant to 5 U.S.C. § 552(a)(6)(A)(i).

97.     Defendants CBP and DHS did not invoke 5 U.S.C. § 552(a)(6)(B) with respect to the Tahirih Supplemental Request and thus were obligated to make a determination on it within 20 business days pursuant to 5 U.S.C. § 552(a)(6)(A)(i).

98.     Defendants USCIS and DHS were obligated to make a determination on the Tahirih Request within 30 business days pursuant to 5 U.S.C. § 552(a)(6)(B).

99.     Defendant USCIS was obligated to make a determination on the Tahirih Supplemental Request within 30 business days pursuant to 5 U.S.C. § 552(a)(6)(B).

100.    Defendants' failure to make a determination and disclose all responsive records within the statutory timeframe violates 5 U.S.C. § 552(a)(3)(A), (a)(6)(A)(i), and (a)(6)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for judgment against Defendants, and that the Court:

a.      Order Defendants DHS, CBP and USCIS to conduct a search for records responsive to the FOIA Requests filed by Plaintiffs American Immigration Council and Tahirih Justice Center under 5 U.S.C. § 552(a)(3)(C);

b.      Order Defendant CBP to produce all records responsive to Plaintiff American Immigration Council's FOIA Request as soon as practicable in accordance with 5 U.S.C. § 552(a)(3)(C);

c.      In the alternative, order Defendant CBP to make a determination and promptly produce records responsive to the Council Request as required by 5 U.S.C. § 552(a)(3)(A) and (a)(6)(A)(i);

d.      Order Defendants DHS and USCIS to make a determination and promptly produce records responsive to the Council Request as required by 5 U.S.C. § 552(a)(3)(A) and (a)(6)(A)(i);

e.      Order Defendants DHS, CBP and USCIS to make a determination and promptly produce records responsive to the Tahirih Request and the Tahirih Supplemental Request as required by 5 U.S.C. § 552(a)(3)(A), (a)(6)(A)(i) and (a)(6)(B);

f.      Enjoin Defendants from improperly withholding records;

g.      Declare that Defendants' failure to conduct an adequate search violates 5 U.S.C. § 552(a)(3);

h.      Declare that all Defendant CBP's failure to process the Council Request as soon as practicable violates 5 U.S.C. § 552(a)(6)(E);

i.    Declare that Defendants' failure to promptly produce records responsive to Plaintiffs' Requests violates 5 U.S.C. § 552(a)(3)(A), (a)(6)(A)(i) and (a)(6)(B);

j.    Award Plaintiffs reasonable attorneys' fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E) and any other applicable statute or regulation; and

k.    Grant such other relief as the Court may deem just, equitable, and appropriate.

Respectfully submitted,

Dated: October 2, 2019

*/s/Claudia Valenzuela*

Claudia Valenzuela (D.C. Bar No. IL0056)
Mary Kenney (D.C. Bar No. 1044695)
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7540
cvalenzuela@immcouncil.org
mkenney@immcouncil.org

Emma Winger*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
(617) 505-5375
ewinger@immcouncil.org

*\* Application for admission pro hac vice forthcoming*