**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN IMMIGRATION COUNCIL; and TAHIRIH JUSTICE CENTER, | |
| Plaintiffs, | Civil Action No. 19-2965 (RC) |
| v. | |
| U.S. CUSTOMS AND BORDER PROTECTION; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 2

   A.  Public Interest in CBP Conducting Credible Fear Interviews ............................. 2

   B.  Procedural History of Plaintiffs' FOIA Requests ............................................. 5

III.  STANDARD OF REVIEW ............................................................................... 11

IV.   ARGUMENT .................................................................................................... 12

   A.  Customs and Border Protection Has Failed to Show that It Conducted a Reasonable Search ............................................................................................................ 12

   B.  Defendants Improperly Withheld Records under Exemption 5 ......................... 14

   C.  Defendants Improperly Withheld Records under Exemptions 6 and 7(c) ........................ 27

V.  CONCLUSION ................................................................................................. 32

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548 (D.D.C. Aug. 31, 2020)......... 4, 29

*Access Reports v. DOJ*, 926 F.2d 1192 (D.C. Cir. 1991) ......................................................... 15

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ............................................................... 28, 31

*Aguirre v. SEC*, 551 F. Supp. 2d 33 (D.D.C. 2008).................................................................. 28

*Albaladejo v. Immigr & Customs Enf.*,
    No. CV 19-3806 (RC), 2021 WL 354173 (D.D.C. Feb. 2, 2021) ........................................... 14

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667 (D.C. Cir. 2016)........... 31

*Animal Legal Def. Fund v. Dep't of Air Force*, 44 F. Supp. 2d 295 (D.D.C. 1999) .................... 16

*Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6 (D.D.C. 2019)............................................................ 27

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980)............................................................. 22

*Butler v. DOJ*, CIV. A. No. 86–2255 HHG, 1994 WL 55621 (D.D.C. Feb. 3, 1994)................... 32

*Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336 (D.D.C. 2018) ............................................. 23

*Citizens for Resp. & Ethics in Washington v. DOJ*,
    No. CV 19-1552 (ABJ), 2021 WL 1749763 (D.D.C. May 3, 2021) ........................... 11, 22, 23

*Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) .............. 15, 19

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
    436 F. Supp. 3d 90 (D.D.C. 2019) ...................................................................................... 24

*Davidson v. U.S. Dep't of State*, 206 F. Supp. 3d 178 (D.D.C. 2016)........................................... 13

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp 2d 83 (D.D.C. 2009)........................... 14

*Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487 (1994) ........................................... 27

*Dep't of the Air Force v. Rose,* 425 U.S. 352 (1976) ........................................................... 11, 12

*DOJ v. Landano,* 508 U.S. 165 (1993) ...................................................................................... 29

*DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ................................. 11

*DOJ v. Tax Analysts*, 492 U.S. 136 (1989).......................................................................... 12, 14

*Electronic Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92 (D.D.C. 2016)) ................................ 15

*Families for Freedom v. CBP*, 797 F. Supp. 2d 375 (S.D.N.Y. 2011) ........................................ 28

*FBI v. Abramson*, 456 U.S. 615 (1982) ...................................................................................... 27

*Gosen v. USCIS*, 75 F.Supp.3d 279 (D.D.C. 2014) .................................................................... 29

*Hall v. DOJ*, 552 F. Supp. 2d 23 (D.D.C. 2008)........................................................................ 30

*Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220 (D.D.C. 2017)........................... 16, 20, 21

*In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998)........................................................................... 22

*In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984)................................................................... 22, 23

*Iturralde v. Comptroller of Currency*, 315 F.3d 311 (D.C. Cir. 2003)................................... 12, 13

*Jennings v. DOJ*, 230 F. App'x 1 (D.C. Cir. 2007) ..................................................................... 12

*Jud. Watch, Inc. v. DHS*, 926 F. Supp. 2d 121 (D.D.C. 2013) ................................................... 22

*Jud. Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019)................. 24, 25

*Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004) ...................... 16, 18, 19

*Jud. Watch, Inc. v. DOJ*,
No. 17-0832 (CKK), 2019 WL 4644029 (D.D.C. Sept. 24, 2019) ............................................ 24

*Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) ................... 28

*Marino v. DOJ*, 993 F. Supp. 2d 1 (D.D.C. 2013) ................................................................... 13

*McKinley v. FDIC*, 744 F. Supp. 2d 128 (D.D.C. 2010) ......................................................... 15

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ............... 22, 25

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ................................................................... 12, 15

*Multi AG Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224 (D.C. Cir. 2008) .................... 27, 30

*Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26 (D.C. Cir. 2002) .................................... 11

*Nat'l Ass'n of Ret. Fed. Emps. v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ................................. 30

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013) ........................................... 16

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............................... 12, 13

*Oglesby v. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ......................................................... 13

*Painting & Drywall Work Pres. Fund, Inc. v. HUD*, 936 F.2d 1300 (D.C. Cir. 1991) ............... 30

*Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) ............... 15, 18

*Pinson v. DOJ*, 145 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... 13

*Pub. Emps. for Env't Resp. v. EPA*, 288 F. Supp. 3d 15 (D.D.C. 2017) ............................ *passim*

*Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018) ............................... 23, 24

*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ......................................................................... 29

*Schonberger v. Nat'l Transp. Safety Bd.*, 508 F. Supp. 941 (D.D.C. 1981) ............................... 27

*Spirko v. U.S. Postal Serv.*, 147 F.3d 992 (D.C. Cir. 1998) .................................................. 27

*Summers v. DOJ*, 140 F.3d 1077 (D.C. Cir. 1998) ................................................................. 25

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ......................................... 25

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) ............................................................. 22

*Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55 (D.D.C. 2013) ............. 16

*Tuffly v. DHS*, 870 F.3d 1086 (9th Cir. 2017) ....................................................................... 28

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ............................................................... 15

*Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir. 1980) ................................................................... 13

*Weisberg v. DOJ*, 705 F.2d 1344 (D.C. Cir. 1983) ............................................................. 12, 14

*Wilbur v. CIA*, 355 F.3d 675 (D.C. Cir. 2004) ....................................................................... 12

**Statutes**

5 U.S.C. § 552(a)(6)(E) ............................................................................................................. 6

5 U.S.C. § 552(a)(8)(A) ...................................................................................................... 11, 23

5 U.S.C. § 552(b) .................................................................................................................... 25

5 U.S.C. § 552(b)(6) ................................................................................................................ 27

5 U.S.C. § 552(b)(7)(C) ........................................................................................................... 27

8 U.S.C. § 1225(b)(1) ........................................................................................................... 3, 6

**Other Authorities**

Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC News (July 29, 2019, 7:31 PM), https://nbcnews.to/2YpVQni............... 3

American Immigration Council, *A Guide to Title 42 Expulsions at the Border* (Mar. 29, 2021), https://bit.ly/3cmlR0O ............................................................................. 5

Zolan Kanno-Youngs, *Asylum Officers Condemn What They Call 'Draconian' Plans by Trump*, N.Y. Times (July 15, 2020), https://nyti.ms/3wtQgC3............................................. 2

Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately — Ignoring Asylum Law*, ProPublica (Apr. 2, 2020, 6:30 PM), https://bit.ly/3fV2DRN .............. 5

Nick Miroff, *U.S. Asylum Screeners to Take More Confrontational Approach as Trump Aims to Turn More Migrants Away at the Border*, Wash. Post (May 7, 2019), https://wapo.st/2JzaEe4..................................................................................... 2

Camilo Montoya-Galvez, *Under Trump-Era Border Rule That Biden Has Kept, Few Asylum-Seekers Can Seek U.S. Refuge*, CBS News (April 14, 2021, 9:45 PM), https://cbsn.ws/2TGYIPT ............................................................................... 5

Molly O'Toole, *Border Patrol Agents, Rather Than Asylum Officers, Interviewing Families For 'Credible Fear'*, L.A. Times (Sept. 19, 2019, 5:50 AM), https://lat.ms/2mqC263.... 3, 4, 16, 30

Reuters Staff, *U.S. Will Assign Dozens of Border Agents to Migrant Asylum Interviews*, Reuters.com (May 9, 2019, 6:09 PM), https://reut.rs/2oeZpjN ........................................... 3, 16

A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019, 10:55 AM), https://bit.ly/2YyJXfu ................................................................................ 3

USCIS, *Refugee, Asylum and International Operations Directorate*, https://bit.ly/3z8XQ76 (last reviewed Mar. 10, 2020)................................................................................... 3

**Regulations**

6 C.F.R. § 5.5(e)........................................................................................... 6

## I.      INTRODUCTION

In the spring of 2019 the Department of Homeland Security (DHS) and its component agencies U.S. Citizenship and Immigration Services (USCIS) and Customs and Border Protection (CBP), collectively "Defendants," made an unprecedented agreement. Defendants began a pilot program to transfer responsibility for conducting asylum screening interviews, known as credible fear interviews, from USCIS—an agency established and trained to carry out immigration benefit adjudications, including asylum claims—to CBP, a law enforcement agency with a well-documented history of antagonism towards asylum-seekers. By May 2019, USCIS had completed training an initial cohort of agents from the U.S. Border Patrol, a component of CBP, to conduct these specialized and sensitive interviews. The pilot program was marked by secrecy throughout, with Defendants releasing virtually no information to the public. The Border Patrol agents who conducted credible fear interviews concealed their identity as law enforcement agents from the asylum seekers they interviewed. In total, approximately 60 agents participated in the pilot program, conducting credible fear interviews for thousands of asylum seekers, until a federal court preliminarily enjoined the program because it was likely unlawful. But Border Patrol agents have continued to play a role in screening fear-based claims for protection from expulsion under Title 42 of the U.S. Code, a controversial policy in itself. As the current administration offers new proposals for screening asylum seekers arriving at the United States border, the public has a compelling interest in knowing like how and why immigration authorities designed a program to replace highly trained asylum officers with CBP officers and the effect the program had on the credible fear process, including on asylum seekers subjected to the program.

In response to Freedom of Information Act (FOIA) requests from Plaintiffs American Immigration Council (Council) and Tahirih Justice Center (Tahirih), collectively "Plaintiffs," Defendants continue to withhold information responsive to Plaintiffs' FOIA request. Defendant CBP produced a single record and has failed to describe the process it used to search for responsive records. Of the 3,744 pages Defendant DHS produced, it withheld 3,211 in full. Defendants DHS and USCIS both improperly withheld records under FOIA Exemption 5, having failed to meet their burden to show that certain challenged responsive records fall within the deliberative process and attorney client privileges. For these reasons, the Court should deny Defendants' motion for summary judgment, grant summary judgment to Plaintiffs, order Defendant CBP to conduct an adequate search, and compel the production of the narrowed list of records that are the subject of Plaintiffs' current challenge.

## II.    BACKGROUND

### A.    Public Interest in CBP Conducting Credible Fear Interviews

The Trump administration experimented with new programs to adjudicate the claims of people seeking asylum. Those efforts inspired impassioned public debate about whether those programs prevented the United States from meeting its obligations towards those seeking protection at its borders. *See, e.g.,* Zolan Kanno-Youngs, *Asylum Officers Condemn What They Call 'Draconian' Plans by Trump*, N.Y. Times (July 15, 2020), https://nyti.ms/3wtQgC3; Nick Miroff, *U.S. Asylum Screeners to Take More Confrontational Approach as Trump Aims to Turn More Migrants Away at the Border*, Wash. Post (May 7, 2019), https://wapo.st/2JzaEe4. At the same time, misconduct by CBP—and Border Patrol in particular—attracted public scrutiny. *See, e.g.,* A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019, 10:55 AM),

https://bit.ly/2YyJXfu. It is no surprise that the pilot project in which Border Patrol agents conducted credible fear interviews was analyzed at length in the media, with emphasis onthe lack of transparency around the program. *See, e.g.,* Molly O'Toole, *Border Patrol Agents, Rather Than Asylum Officers, Interviewing Families For 'Credible Fear',* L.A. Times (Sept. 19, 2019, 5:50 AM), https://lat.ms/2mqC263 [hereinafter "O'Toole, *Border Patrol agents*"]; Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC News (July 29, 2019, 7:31 PM), https://nbcnews.to/2YpVQni.

A credible fear interview (CFI) is a threshold screening in the asylum process conducted by an "asylum officer" that constitutes an essential backstop against summary deportation for those who fear persecution or torture in their country of removal. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B), (E). Since 2002, USCIS, the agency tasked with adjudication of asylum claims, has employed, housed, and trained the asylum officers who conduct CFIs. *See* USCIS, *Refugee, Asylum and International Operations Directorate*, https://bit.ly/3z8XQ76 (last reviewed Mar. 10, 2020). CBP, "one of the world's largest law enforcement organizations,"[1] played the limited role of referring asylum seekers it arrests to an asylum officer for a CFI, as required by statute. *See* 8 U.S.C. § 1225(b)(1)(A)(ii).

In the spring of 2019, this changed. According to media reports, on May 9, 2019, DHS representatives told a congressional committee that it had already begun training Border Patrol agents to conduct CFIs. Reuters Staff, *U.S. Will Assign Dozens of Border Agents to Migrant Asylum Interviews*, Reuters.com (May 9, 2019, 6:09 PM), https://reut.rs/2oeZpjN [hereinafter "Reuters, *U.S. will assign border agents*"] ("Ten border agents are currently undergoing the

---

[1] U.S. Customs & Border Prot., *About CBP*, https://www.cbp.gov/about (last modified Dec. 18, 2020).

training to conduct 'credible fear' screenings of asylum seekers, and two other groups of 20 to 25 agents each have been designated to receive the training, said Robert Perez, deputy commissioner at U.S. Customs and Border Protection (CBP), in testimony to members of the House of Representatives Homeland Security Committee."); *see* O'Toole, *Border Patrol agents* (reporting that Border Patrol officers began training for the pilot in April 2019). By May 2019, ten Border Patrol agents had completed a truncated training for the pilot program and began conducting CFIs on June 5, 2019. Winger Decl. ¶ 8, Exh. E, Decl. of Ashley Caudill-Murillo at ¶ 8. Two more cohorts joined the pilot program, such that by July 2019, 57 Border Patrol agents were preparing to conduct CFIs. Winger Decl. ¶ 6, Exh. B, Email from John Lafferty, July 16, 2019. By November 2019, Border Patrol agents had conducted 3,219 CFIs and found only 37.8% of those individuals to have a credible fear, Winger Decl. ¶ 6, Exh. C, CBP Activity Summary to Date, Nov. 19, 2019, far lower than the roughly 80% of asylum seekers who passed these threshold interviews when conducted by USCIS asylum officers, O'Toole, *Border Patrol agents*. Border Patrol agents frequently refused to identify themselves as such to the people they interviewed, preventing asylum seekers from challenging their negative credible fear determinations on the basis that the interviewing officer was unqualified to make the determination. Fluharty Decl. ¶¶ 11, 14-18, 21-24. On August 31, 2020, a federal court found that the pilot program likely violated the Immigration and Nationality Act because the Border Patrol agents were inadequately trained for their new role, and preliminarily enjoined the program. *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548 (D.D.C. Aug. 31, 2020). Defendants did not appeal this order.

Nevertheless, CBP—through its Border Patrol agents—has continued to play a role in screening fear-based claims for protection. Since March 2020, CBP has been summarily

expelling migrants arriving at the southern border pursuant to public health authority at Title 42 of the U.S. Code. *See* American Immigration Council, *A Guide to Title 42 Expulsions at the Border* (Mar. 29, 2021), https://bit.ly/3cmlR0O. While individuals fleeing persecution are unable to apply for asylum, they may seek protection under the Convention Against Torture, but only if they affirmatively raise a claim for protection with a Border Patrol agent, who must determine whether the claim is "reasonably believable." Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately — Ignoring Asylum Law*, ProPublica (Apr. 2, 2020, 6:30 PM), https://bit.ly/3fV2DRN. Like the pilot program that is the subject of Plaintiffs' FOIA requests, the use of Title 42 to block asylum-seekers from applying for protection is the subject of ongoing public debate, and many details are unknown to the public. *See, e.g.,* Camilo Montoya-Galvez, *Under Trump-Era Border Rule That Biden Has Kept, Few Asylum-Seekers Can Seek U.S. Refuge*, CBS News (April 14, 2021, 9:45 PM), https://cbsn.ws/2TGYIPT. The credible fear pilot program remains very relevant as the public attempts to piece together the various roles CBP—a border enforcement agency—has played and continues to play in the process of evaluating eligibility for protection in the United States. As current and future administrations continue to re-think the role CBP plays in arresting, processing, and adjudicating the claims of asylum seekers, it is necessary that the public be informed by a full understanding of what happened during the credible fear pilot program.

> **B.    Procedural History of Plaintiffs' FOIA Requests**

In order to shed light on changes to the credible fear process and the role of CBP, the Council submitted a FOIA Request ("Council Request") to DHS, CBP, and USCIS on May 20, 2019. Dkt. 1-1. The Council Request sought records regarding changes to the credible fear process that either have been implemented since January 20, 2017 or are currently planned and

that relate to CBP officers or agents conducting interviews and making determinations regarding credible fear under 8 U.S.C. § 1225(b)(1)(B). *Id.* The Council Request further sought expedited processing by each Defendant "because there is 'an urgency to inform the public about an actual or alleged federal government activity' by organizations 'primarily engaged in disseminating information'" under 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). *Id.* at 5-6.

On May 20, 2019, shortly after submitting the Request, the Council received an e-mail reply from USCIS and an e-mail delivery confirmation receipt from DHS. Dkts. 1-2, 1-3. In a letter dated May 21, 2019, CBP acknowledged receipt of the Request and reported that "the average time to process a FOIA request related to 'travel/border incidents' is a minimum of 3-6 months." Dkt. 1-4. Also on May 21, 2019, the Council received e-mail notifications from CBP granting the request to expedite the processing and waiving all processing fees. Dkts. 1-5, 1-6.

To promote greater transparency regarding the apparent new pilot program to train and deploy CBP agents to conduct CFIs and or RFIs for asylum seekers, Tahirih submitted a FOIA Request dated July 5, 2019 ("Tahirih Request") to DHS, CBP, and USCIS. Dkt. 1-9. The Tahirih Request sought any and all records that were prepared, received, transmitted, collected and/or maintained by CBP , USCIS , and/or DHS that describe, refer or relate to (1) CBP officers conducting or potentially conducting CFIs or RFIs, (2) any training or proposed training related to CBP officers conducting or potentially conducting CFIs or RFIs, and/or (3) the proposed or actual implementation of (1) or (2) (collectively, the "Program"). *Id.* Tahirih submitted a Supplemental FOIA Request to DHS, CBP, and USCIS ("Tahirih Supplemental Request") dated August 2, 2019. Dkt. 1-10. The Tahirih Supplemental Request sought any and all records that were prepared, received, transmitted, collected and/or maintained by CBP, USCIS, and/or DHS

relating to the use of CBP officers to conduct CFIs and/or RFIs not covered by the Tahirih
Request. *Id.*

In a letter dated July 10, 2019, Defendant DHS acknowledged receipt of the Tahirih
Request, invoked the ten-day extension to respond, and conditionally granted the fee waiver
request. Dkt. 1-11. In a letter dated August 5, 2019, Defendant CBP acknowledged receipt of the
Tahirih Supplemental Request and did not explicitly invoke the ten-day extension. Dkt. 1-13. In
two letters dated August 9, 2019, Defendant USCIS provided responses to Plaintiff Tahirih. In
one response, Defendant USCIS stated that the documents requested in the Tahirih Request "are
not under the purview of USCIS" and stated it was referring that request to CBP. Dkt. 1-16. In
the other response, Defendant USCIS stated that it had received the Tahirih Supplemental
Request, that this request appeared to be a duplicate of the initial Tahirih Request and that it was
closing the Tahirih Supplemental Request for this reason. Dkt. 1-17. Finally, in a letter dated
August 20, 2019, Defendant USCIS provided a third response, stating that it was assigning both
the Tahirih Request and the Tahirih Supplemental Request to Track 2 (complex request),
invoked the ten-day extension to respond and granted Tahirih Justice Center's request for a fee
waiver. Dkt. 1-18.

By October 2, 2019, none of the Defendants had provided any substantive response to the
Plaintiffs. Faced with an urgent need to uncover information about an ongoing program that
threatened the rights of asylum-seekers, Plaintiffs filed this lawsuit. Dkt. 1. Plaintiffs promptly
reached out to Defendants' counsel to discuss expediting productions in this case. Winger Decl. ¶
3. By email dated October 25, 2019, Plaintiffs requested that Defendants provide an expedited
initial production of seven prioritized categories of records on or before December 12, 2019. *Id*.
The parties then engaged in several meet and confer communications to refine and narrow the

scope of the seven prioritized categories. *Id.* As a result of the parties' meet and confer

discussions, on November 18, 2019, Plaintiffs submitted a revised list of the seven prioritized

categories of documents for expedited production. *Id.* Those categories were: (1) any

memorandum of understanding between CBP, USCIS and/or DHS regarding the use of CBP

officers to conduct credible fear interviews (CFIs) and/or reasonable fear interviews (RFIs); (2)

any written lesson plans, any curricula, and any training materials provided to CBP officers; (3)

protocols or policies for evaluating whether a CBP officer may conduct these interviews,

including materials used to evaluate and test CBP officers with respect to their training and/or

ability to conduct CFIs or RFIs, excluding the results of any testing or evaluation of individual

officers; (4) protocols or policies addressing how CBP officers will be supervised in conducting

CFIs or RFIs and making credible and reasonable fear determinations; (5) any written policy

directives, written policy guidelines, or written procedures concerning the expansion of the pilot

program that reportedly trained approximately 60 CBP officers to conduct CFIs or RFIs; (6) any

written communications from DHS, CBP, or USCIS Headquarters to CBP or USCIS personnel

about CBP conducting CFIs or RFIs; and (7) any existing reports showing grant/denial rates for

CFIs/RFIs conducted by CBP officers. *Id.* For purposes of an expedited production, Plaintiffs

narrowed the seven categories to include only final versions of records and to cover records

created on or after January 1, 2019, but expressly reserved the right to seek non-final versions

beyond any expedited productions. *Id.*

      Defendant CBP limited its search to the seven prioritize categories of records. [2] Howard

Decl. ¶¶ 6-7, Dkt. 28-5. Defendant CBP did not search for categories two, three, four, six, or

---

[2] Plaintiffs agreed to consider, after receiving productions responsive to the seven prioritized
categories, where the expedited productions satisfied the entirety of their FOIA requests. Dkt. 15,

seven. *Id.* Defendants USCIS and DHS did not limit their search to the seven prioritized categories. *Id.* Only Defendant CBP produced any records by the expedited December 12, 2019 deadline. Winger Decl. ¶ 5.

Defendants began making productions to Plaintiffs. On December 12, 2019 Defendant CBP made a single production, consisting of one document—a July 2019 Memorandum of Agreement between CBP and DHS, with the agency points of contact redacted. Dkt. 28-5 ¶¶ 7-9; Winger Decl. ¶ 5, Exh. A. Defendant USCIS made nine productions beginning in January 2020, with certain records partially withheld and a limited number of records withheld in full. Dkt. 28-4 ¶¶ 17-19. Defendant DHS made nine productions beginning in February 2020. Dkt. 28-3 ¶¶ 20-27, 29. Of the 3,744 pages Defendant DHS initially produced in this case, 3,211 were withheld in full, 392 were produced in full, and 141 were withheld in part. *Id.* The bulk of Defendants' productions were completed by October 2, 2020. Dkt. 28-5 ¶¶ 7-9; Dkt. 28-4 ¶¶ 17-19; Dkt. 28-3 ¶¶ 20-27. On May 20, 2021, the day after Defendants filed their motion for summary judgment, Defendant DHS made another production of 82 pages. Winger Decl. ¶ 17, Exh. F. Defendant DHS withheld 7 pages in part and the remainder in full. *Id.*

On December 4, 2020, Plaintiffs narrowed the scope of their challenges to Defendants' productions. Winger Decl. ¶¶ 9-12. Specifically, with respect to USCIS, Plaintiffs informed Defendants' counsel that they would only challenge withholdings in part one of the agency's March 27, 2020 production as well as USCIS' withholding of the names of CBP agents throughout its productions (noting that these withholdings were concentrated primarily in the January 31, 2020 production). *Id.* ¶ 11. Plaintiffs reserved the right to challenge the adequacy of USCIS' search. *Id.*

---

¶ 3. Because the adequacy of Defendant CBP's search for the seven prioritized categories remains in dispute, it is premature for Plaintiffs to determine whether Defendant CBP has provided responsive documents sufficient to satisfy the FOIA requests. *See* Part IV.A.

With respect to CBP, Plaintiffs challenged the adequacy of the agency's search, which produced only a single document, and the withholding of names and email addresses in that production. *Id.* ¶ 10. With respect to DHS, however, Plaintiffs were unable to narrow the scope of their challenges because Plaintiffs knew nothing about the documents DHS had withheld. *Id.* ¶ 12. Having received *Vaughn* indexes from Defendants DHS and USCIS, Plaintiffs have further narrowed the scope of their challenge. The following issues and records are currently in dispute:

- The adequacy of Defendant CBP's search for the seven prioritized categories of documents for expedited production.

- Defendant USCIS' withholdings of the following records under the deliberative process privilege in Exemption 5:

    - "US Border Patrol - USBP Credible Fear Pilot Program May 8, 2019." Dkt. 28-4 at 10.
    - April 17, 2019 version of "US Border Patrol – USBP Credible Fear Pilot Program." Dkt. 28-4 at 11.
    - "Credible Fear Training for USBP Plan dated May 1, 2019." Dkt. 28-4 at 11.
    - "USCIS draft document of Asylum Facts and Status as of July 15, 2019." Dkt. 28-4 at 10.
    - "Draft response to a media inquiry about a USCIS pilot program to train US Border Patrol Agents about how to conduct credible fear interviews." Dkt. 28-4 at 13.
    - "Draft talking points for the USCIS Director to present about the assistance CBP agents in the Los Angeles Office are providing to help with credible fear interviews." Dkt. 28-4 at 13-14.

- Defendant DHS' withholdings of the following records under the deliberative process privilege in Exemption 5:

    - "Issue paper regarding U.S. Border Patrol Credible Fear Program, dated May 16, 2019." Dkt. 28-3 at 36.
    - "CBP Presser April 8 – Draft Briefing Memo." Dkt. 28-3 at 45.
    - "Draft Outline." Dkt. 28-3 at 45.
    - "AS1 Immigration Strategy Tracker (revised 11.14.19)." Dkt. 28-3 at 61.

- • "AS1 Immigration Strategy Tracker 5.20." Dkt. 28-3 at 61.
- • "CBP meeting mk edits Clean v1.1." Dkt. 28-3 at 61.
- Defendant DHS' withholding of the following record under the deliberative process and attorney client privileges in Exemption 5:
  - • "Email chain – re: interviews suspended." Dkt. 28-3 at 61.
- Defendant USCIS' withholding of the names of CBP officers in an email from Rhonda Roberts, dated July 23, 2019. Winger Decl. ¶ 6, Exh. D.

## III.    STANDARD OF REVIEW

FOIA was intended "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976) (internal quotation marks omitted). "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Rose,* 425 U.S. at 361). "At all times[,] courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure,' . . . and that the statutory exemptions, which are exclusive, are to be 'narrowly construed[.]'" *Id.* (internal citations omitted). Under the 2016 FOIA Improvement Act, "an agency may withhold information pursuant to an exemption only if it 'reasonably foresees that disclosure would harm an interest protected by' that exemption." *Citizens for Resp. & Ethics in Washington v. DOJ*, No. CV 19-1552 (ABJ), 2021 WL 1749763, at *4 (D.D.C. May 3, 2021) (quoting 5 U.S.C. § 552(a)(8)(A)).

Against this backdrop, the FOIA statute is unique in administrative law in that it places the burden of justifying failure to produce responsive records on the defendant agency and mandates *de novo* judicial review. *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). "The burden is on the agency to demonstrate, not the requester to disprove,

that the materials sought . . . have not been improperly withheld." *DOJ v. Tax Analy*sts, 492 U.S. 136, 142 n.3 (1989) (internal quotation marks omitted).

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.    ARGUMENT

All three Defendants have failed to meet their burden to justify withholding records that would otherwise permit the "light of public scrutiny" on a program that a federal court has found likely violated the law.  *Rose,* 425 U.S. at 361. First, Defendant CBP has failed to show that it conducted an adequate search. Second, Defendants DHS and USCIS have failed to establish that records were properly withheld under FOIA Exemption Five under either the deliberative process or attorney client privileges. Finally, Defendants have failed to justify the withholding of the names of the CBP officers who participated in the secretive pilot program.

### A.    Customs and Border Protection Has Failed to Show that It Conducted a Reasonable Search

The general dictates of FOIA establish that the burden is on the agency to "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)). A FOIA search's adequacy is "generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Jennings v. DOJ*, 230 F. App'x 1, 1 (D.C. Cir. 2007) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). A search is adequate when it is "reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). Agencies do not need to search "every record system" for the requested documents but "must conduct a good

faith, reasonable search of those systems." *Marino v. DOJ*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). An agency "cannot limit its search to only [some] record system[s] if there are others that are likely to turn up the information requested." *Nation Magazine*, 71 F.3d at 891 (quoting *Oglesby*, 920 F.2d at 68).

The agency must show the adequacy of its search with "reasonably detailed" declarations describing the scope of the search. *Pinson v. DOJ*, 145 F. Supp. 3d 1, 12 (D.D.C. 2015) (quoting *Iturralde*, 315 F.3d at 313-14). A conclusory statement is insufficient. *See Pinson*, 145 F. Supp. 3d at 12. A statement that does not provide information regarding which files were searched, the approach to document location, and specific enough information to challenge the procedure used is insufficient. *Id.* (quoting *Weisberg v. DOJ*, 627 F.2d 365, 370 (D.C. Cir. 1980)). A search that is conducted but inadequate and a search that is not conducted are two legally cognizable issues when evaluating the reasonableness of an agency's search. *See Davidson v. U.S. Dep't of State*, 206 F. Supp. 3d 178, 190-91 (D.D.C. 2016).

Plaintiffs challenge both CBP's failure to search with respect to certain categories of documents and CBP's failure to adequately describe the search it did conduct. First, on the face of its declaration, Defendant CBP conducted no search at all with respect to multiple categories of requested documents. The declaration provided by Patrick Howard indicates that CBP elected not to search categories 2-4 and 6-7 of the expedited request on the grounds that it "determined" that USCIS or DHS were more likely to have responsive documents. Howard Decl. ¶ 7, Dkt. 28-5. Mr. Howard provides no explanation as to how CBP made this "determination" or why CBP was for this reason excused from searching. The agency must explain why a source "would not produce additional responsive records." *Davidson*, 206 F. Supp. 3d at 191.

The search that CBP did conduct—of documents responsive to categories 1 and 5—produced exactly one document. Howard Decl. ¶ 7. The CBP declaration fails to provide any information regarding how the U.S. Border Patrol searched for and located the sole responsive record, but not others. *Id.* This is furthermore problematic because there is reason to believe that additional responsive records exist. CBP produced a single record, dated July 2019, for a ground-breaking program that employed its officers from April 2019 through August 2020. *See supra* Part II.A. For example, it is doubtful that CBP has no records related to the evaluation, training, or supervision of its own agents. Moreover, where many of the records Defendants DHS and USCIS have produced are in draft form, an adequate search by Defendant CBP might well uncover final versions. *See, e.g.,* "Issue paper regarding U.S. Border Patrol Credible Fear Program, dated May 16, 2019," Dkt. 28-3 at 36; "CBP Presser April 8 – Draft Briefing Memo," Dkt. 28-3 at 45.

Because CBP failed to adequately describe its search for responsive records, or justify its failure to search for certain records, it has not met its burden to demonstrate how its search was "reasonably calculated to uncover all relevant documents." *Weisberg*, 705 F.2d at 1351; *See e.g. Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp 2d 83, 91 (D.D.C. 2009) (search inadequate when agency fails to "explain in reasonable detail the scope and method of the agency's search"); *Albaladejo v. Immigr & Customs Enf.*, No. CV 19-3806 (RC), 2021 WL 354173, at *5–6 (D.D.C. Feb. 2, 2021) (finding the agency's search deficient because it failed to meaningfully search locations where responsive records may be located).

**B.      Defendants Improperly Withheld Records under Exemption 5**

It is Defendants' burden to demonstrate that documents were properly withheld under Exemption 5. *See Tax Analysts*, 492 U.S. at 142 n3. To carry their burden, Defendants "must provide 'a relatively detailed justification, specifically identifying the reasons why a particular

exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply."" *Pub. Emps. for Env't Resp. v. EPA*, 288 F. Supp. 3d 15, 22 (D.D.C. 2017) (quoting *Electronic Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016)). "[C]onclusory and generalized allegations of exemptions are unacceptable." *Morley*, 508 F.3d at 1115 (internal quotations omitted). As discussed at length below, the *Vaughn* indexes that Defendants DHS and USCIS produced are filled with boilerplate language and generalities that do not provide the detail or specificity required to overcome the presumption of disclosure. As such, Defendants have failed to meet their burden.

1.   *Defendants Improperly Withheld Documents Under the Deliberative Process Privilege*

"To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). A record only qualifies for withholding if it is both "predecisional" and "deliberative." *Access Reports v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). "A document is predecisional if it is generated 'before the adoption of an agency policy.'" *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010) (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Records are "deliberative" if they reflect "the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. "[T]o come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975).

"When the deliberative process privilege is at issue, the need for an agency to describe all of the information it withheld is 'particularly acute because the deliberative process privilege is

so dependent upon the individual document and the role it plays in the administrative process.'" *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting *Animal Legal Def. Fund v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999)).    Given this "heightened requirement" for deliberative process, in order to meet its burden, the withholding agency "must address the following areas: '(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.'" *Id.* at 241, 243 (quoting *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)). "Each of these areas must be addressed with reasonable specificity—a 'broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional.'" *Id.* at 241 (quoting *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013)).

For the records at issue here, Defendants DHS and USCIS have failed to identify the nature of the specific deliberative process at issue or the function and significance of each document in any deliberative process, especially where the withheld records post-date the April 2019 decision to implement the pilot. *See* Reuters, *U.S. will assign border agents* (reporting that DHS representatives described the already initiated pilot to congressional committee on May 9, 2019); O'Toole, *Border Patrol agents* (reporting that the first cohort of Border Patrol agents began training in April 2019); *see also* Winger Decl. ¶ 8, Exh. E, Decl. of Ashley Caudill-Murillo at ¶ 8. "The most basic requirement of the privilege is that a document be *antecedent* to the adoption of an agency policy." *Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004) (emphasis in original). Where a "record explains . . . choices that had already

been made, it cannot be called predecisional and it therefore cannot be shielded under Exemption

5." *Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 25.

        a.   *Defendant USCIS' Challenged Records*

      Defendant USCIS' failure to identify the particular deliberative process at issue and the

role of the document, especially where many of the withheld records appear to be designed to

explain decisions already made or report facts regarding the operation of the pilot, is illustrated

by looking to the limited information USCIS provided in the *Vaughn* index for challenged

records themselves. The declaration from Terri White adds no more detail beyond what is

provided in the *Vaughn* index. White Decl. at ¶¶ 20-22, Dkt. 28-4.

      *Credible Fear Pilot Program and Credible Fear Training Plan*: There are what appear to

be three different documents listed as one entry in the *Vaughn* index, all of which post-date the

April 2019 start of the pilot. Dkt. 28-4 at 10-12. One is labeled as "US Border Patrol - USBP

Credible Fear Pilot Program May 8, 2019."  Dkt. 28-4 at 10-11. USCIS describes this as

"[d]ocumentation about how the pilot program would work to include purpose, roles,

responsibilities, training plan, workforce, and resources." *Id.* The second document is apparently

another version of the same document, dated April 17, 2019. *Id.* at 11. The third document is

labeled "Credible Fear Training for USBP Plan dated May 1, 2019" and described as

"[i]nformation about how many CBP employees will receiving training and descriptions about

the training CBP officers will receive." *Id.* In defense of withholding these documents in full,

Defendant USCIS provides conflicting explanations—first based on "the deliberative process

regarding development of the Credible Fear Task Force Pilot Program" and then based on "the

deliberative process used to evaluate the Pilot Program, the status of such an internal review, and

the methods utilized to conduct such review."[3] *Id.* Defendant USCIS has failed to identify the role these documents played in any deliberative process, where the descriptions strongly suggest that they are explaining actions to be taken in implementing an already established pilot program. *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 25.

*Asylum Facts and Stats*: This is a document described as "USCIS draft document of Asylum Facts and Status as of July 15, 2019." Dkt. 28-4 at 10. With respect to this document, the *Vaughn* index says only that "[t]he material withheld is pre-decisional deliberative information between the USCIS Office of the [D]irector and staff employees who are working on developing talking points with respect to asylum facts and stats." *Id.* This largely descriptive language is insufficient. First, it fails to identify the deliberative process at issue, because it does not establish that it is antecedent to any particular agency policy. This July 2019 record post-dates by many months the decision to implement the pilot program. If these talking points merely explain agency decisions already made, they are not predecisional. *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 25; *Jud. Watch, Inc.*, 297 F. Supp. 2d at 263 (holding that material prepared for congressional testimony is not predecisional if it merely explains decisions already made). Second, if, as the title suggests, this record describes facts and statistics, then it is not part of any deliberative process. *See Petroleum Info. Corp.*, 976 F.2d at 1434 ("Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt."). Third, it is not sufficient for the agency to rely on the label "draft." "A post-decisional document, draft or no, by definition cannot be 'predecisional.'"

---

[3] The *Vaughn* index suggests that one or more of these three documents is a draft. Dkt. 28-4 at 11. Assuming this is true, the mere fact that a document is a draft does not render it subject to the deliberative process, where the agency has otherwise failed to meet its burden. *See Jud. Watch, Inc.*, 297 F. Supp. 2d at 260-61.

*Jud. Watch, Inc.*, 297 F. Supp. 2d at 260; *see id.* at 261 (holding that even where a document is predecisional, "drafts are not presumptively privileged" and the agency must still "identify the 'function and significance in the agency's decisionmaking process' of the redacted and withheld documents") (internal citation omitted). Finally, at a minimum, as discussed below, it is plain this record contains facts that should be segregated and produced. *See infra* Part IV.B.4.

*Draft Statements*: Similarly, there are two documents with separate *Vaughn* entries that describe draft statements regarding the pilot program, without establishing whether these drafts are predecisional or merely explain a program that was already up and running. Dkt. 28-4 at 13 ("Draft response to a media inquiry about a USCIS pilot program to train US Border Patrol Agents about how to conduct credible fear interviews); *id.* at 13-14 ("Draft talking points for the USCIS Director to present about the assistance CBP agents in the Los Angeles Office are providing to help with credible fear interviews.").

      b. *Defendant DHS' Challenged Records*

Defendant DHS has similarly failed to meet the "heightened standard" to justify withholding records under the deliberative process privilege. The declaration from Catrina Pavlik-Keenan adds no significant detail beyond what is provided in the *Vaughn* index. Pavlik-Keenan Decl. at ¶¶ 35, 37-38, 41-42, Dkt. 28-3.

*Email Chain:* This record identified only as "Email chain – Re: interviews suspended." Dkt. 28-3 at 61. The agency reports in broad terms that the record is "an internal to DHS email chain consisting of 145 pages reflecting confidential, internal communications pertaining to legal issues associated with the draft USCIS delegation to CBP and the related draft MOU between CBP and USCIS." *Id.* Again, it is unclear whether "communications pertaining to legal issues" is pre- or post- decisional or even deliberative. *See Coastal States Gas Corp.*, 617 F.2d at 866.

*Issue Paper and Briefing Memo*: These are two documents with separate *Vaughn* entries where the agency relies entirely on the draft nature of the records to defend their withholding. One is a record identified as "Issue paper regarding U.S. Border Patrol Credible Fear Program, dated May 16, 2019." Dkt. 28-3 at 36. The agency states only that it is a "non-final version of an issue paper" with highlighted comments and "action items." *Id.* The second is identified as "CBP Presser April 8 – Draft Briefing Memo." Dkt. 28-3 at 45. The agency asserts that "[t]his predecisional document is a briefing memo titled 'CBP Migration Statistics – Fiscal Year 2019 Year to Date'" marked "draft" with edits and comment bubbles and placeholders for input. *Id.* First, the first record clearly post-dates the April 2019 decision to launch the pilot program and DHS has provided insufficient information to confirm that the second record pre-dates that decision. Second, if these relate to some other decision, DHS has failed to adequately identify the nature of that deliberative process or the role these records play in that process. It is not enough that the records are "non-final"—if the issue paper or briefing memo describe decisions already made or play no role in shaping agency policy, they are not properly withheld under the deliberative process exception. *See Hunton & Williams*, 248 F. Supp. 3d at 240. At a minimum, factual information should be segregated and produced. *See infra* Part IV.B.4.

*Draft Outline*: This record is identified as "AS1-Outline of Immigration Actions_5 May Draft-Draft Outline." Dkt. 28-3 at 45. The agency describes this as "a 5 page working draft document . . . . titled 'Department of Homeland Security, Strategy to Address Crisis at the Southern Border, Draft Outline.' Portions of the document are not populated/left open for further input. This working draft document reflects internal discussions between DHS employee [sic] how to address the crisis at the Southern Border, including information DHS may have determined was confidential and not appropriate for release." *Id.* It is not clear, however, from

this brief description whether it pre-dates any particular decision or describes decisions already made "to address the crisis at the Southern Border." *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 25.

*ASI Immigration Strategy Trackers and CBP Meeting Topics*: Finally, for several withheld records, Defendant DHS provided almost no information at all. *See* Dkt. 28-3 at 62 (document titled "AS1 Immigration Strategy Tracker (revised 11.14.19)" with only description as "Exemption (b)(5) has been applied to draft operational strategies considered and evaluated by the Agency. Release of these strategies would disclose deliberations concerning sensitive enforcement priorities."); *id.* (document titled "AS1 Immigration Strategy Tracker 5.20" with identical description); *id.* (document titled "CBP meeting mk edits Clean v1.1" with only description as "Exemption (b)(5) has also been applied to potential topics of discussion between CBP and USCIS regarding a number of immigration programs and initiatives. Release of these topics of discussion would disclose deliberations concerning sensitive priorities.").

Because Defendants USCIS' and DHS' disclosures "are insufficiently specific about the deliberative process at issue and the function and significance of each record in that process" Defendants have failed to meet their burden to justify the withholdings in this case. *Hunton & Williams*, 248 F. Supp. 3d at 243; *id.* at 242-43 (finding agency description that "[t]he withheld information is deliberative because EPA employees and managers were still internally discussing issues concerning responsive records and how to best coordinate the Agency's response, and were providing advice to the decision makers" insufficient because it failed to establish the record was "generated as part of a definable decision-making process") (internal quotation omitted).

2.    *Defendants Improperly Withheld Documents Under the Attorney-Client Privilege*

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (citing *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)). "The privilege also protects communications that flow from attorneys to their clients, but only if the communications are based, at least in part, on confidential information obtained from the client." *Citizens for Resp. & Ethics in Wash. v. DOJ*, No. CV 19-1552 (ABJ), 2021 WL 1749763, at *7 (D.D.C. May 3, 2021), *appeal pending*, No. 21-5113 (D.C. Cir. May 25, 2021) (citing *In re Sealed Case*, 737 F.2d at 98–99). It is the claimant's burden "to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty . . . that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d at 99 (internal citation omitted and citing *Brinton v. Dep't of State*, 636 F.2d 600, 603-04 (D.C. Cir. 1980)).

The mere fact that the communication involves a member of the bar does not end the inquiry. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977) ("The privilege does not allow the withholding of documents simply because they are the product of an attorney-client relationship . . . . "). For instance, the privilege does not extend to a "government attorney's 'advice on political, strategic, or policy issues, valuable as it may [be].'" *Jud. Watch, Inc. v. DHS,* 926 F. Supp. 2d 121, 145 (D.D.C. 2013) (quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998), *aff'd in part, rev'd in part on other grounds*, 158 F.3d 1263 (D.C. Cir. 1998) (per curiam)). "And, where an agency lawyer serves in a mixed capacity that includes responsibilities that fall both within and 'outside the lawyer's sphere,' that lawyer's advice will be protected only to the extent that the lawyer offered it in their professional, legal

capacity." *Citizens for Resp. & Ethics in Washington*, 2021 WL 1749763, at *7 (citing *In re Sealed Case*, 737 F.2d at 99). "In this context, to invoke the privilege, [the agency] must establish that securing legal advice was a 'primary purpose' of the agency's communication." *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 347 (D.D.C. 2018).

Rather than meet these exacting standards, Defendant DHS has used boilerplate to assert the attorney-client privilege. In each instance, the agency used identical stock language:

> Portions of the withheld information may also be considered confidential communications between attorney and client [DHS] and as such is protected by the attorney-client privilege. The disclosure of attorney-client privileged information would inhibit the ability of the agency to seek and obtain legal advice from counsel, as well as provide those involved in litigation with the Department information and insight regarding the Department's legal position and strategies on certain matters, the release of which would harm the Department's ability to defend itself before a Court.

Email chain RE interviews suspended, Dkt. 28-3 at 61. This boilerplate, in combination with the vague descriptions of the relevant records, discussed above, does not sustain the agency's burden that any particular record contains protected legal advice that should be shielded from disclosure. *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 22.

### 3.  *Defendants Have Not Demonstrated Reasonably Foreseeable Harm From Disclosure*

The 2016 FOIA Improvement Act codified the "foreseeable harm" standard established administratively in 2009 by then-Attorney General Holder. *Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018), *partial reconsideration on other grounds*, 442 F. Supp. 3d 240 (D.D.C. 2020). The FOIA now provides that "[a]n agency shall . . . withhold information under this section only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (II) disclosure is prohibited by law . . . ." 5 U.S.C. § 552(a)(8)(A)(i). This court has held that the "foreseeable harm"

requirement imposes a "heightened standard" on agencies. *Jud. Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). To carry "this independent and meaningful burden," *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld." *Judicial Watch, Inc. v. DOJ*, No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). Further, while agencies "may take a categorical approach—that is, group together like records" *Rosenberg*, 342 F. Supp. 3d at 78, the agency cannot rest on "nearly identical boilerplate statements" and "generic and nebulous articulations of harm." *Judicial Watch*, 2019 WL 4644029, at *4-5.

Here Defendants have done just that—relied on boilerplate to justify the harm. Defendants USCIS and DHS use "identical boilerplate statements" of harm for each of the withheld documents, despite the diversity of records at issue. Dkt. 28-4 at 10-15[4]; Dkt. 28-3 at 36, 45, 61 ("Disclosure of this information would be misleading, as well as inhibit the candid

---

[4] Defendant USCIS' description of harm consists of the following:

> Disclosure of the information would (1) impair open, frank discussions on matters of policy between subordinates and superiors; (2) lead to a premature disclosure of proposed policies before they are actually finalized and adopted; and (3) create public confusion that might result from disclosure of reasons discussed and rationales that were not in fact ultimately the grounds for an agency's action in its final decision making. Releasing the information withheld would chill or deter USCIS employees form engaging in the candid and frank discussions that are so important and necessary when employees are working and sharing ideas to put together accurate agency information which will ultimately be provided to the public once that information is final.

Dkt. 28-4 at 10, 13, 14.

discussion of issues between employees."). Further, in three instances, Defendant DHS has simply failed to identify any interest protected by the deliberative process privilege. Dkt. 28-3 at 62 ("Release of these [strategies/topics of discussion] would disclose deliberations concerning sensitive agency priorities."). These boilerplate or nebulous statements of harm cannot meet the "heightened standard" for establishing foreseeable harm. *Jud. Watch, Inc.*, 375 F. Supp. 3d at 100.

4.     *Defendants Did Not Release All Reasonably Segregable Information*

Because "[t]he focus of the FOIA is information, not documents [ ] an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc.*, 566 F.2d at 260. Rather, FOIA requires the agency to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b); *see also* 566 F.2d at 260 ("It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."). "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citing *Summers v. DOJ*, 140 F.3d 1077, 1081 (D.C. Cir. 1998)).

As discussed, Defendant DHS withheld 3,211 pages in full, including all the records Plaintiffs now challenge.[5] Yet DHS offers only a general assertion that it conducted a "line by line review, and all releasable information has been released pursuant to the FOIA." Pavlik-

---

[5] Plaintiffs note that the Bates numbers on Defendant DHS' *Vaughn* index do not correspond with the Bates stamps on the productions released to Plaintiffs. Nevertheless, because so few records were released, even in part, Plaintiffs are able to confirm that the challenged records were withheld in full.

Keenan Decl. at ¶ 53, Dkt. 28-3. Similarly, Defendant USCIS's *Vaughn* index repeatedly asserts that "[a]ll other information was segregated and reviewed line by line and determined non-exempt and disclosed." Dkt. 28-4 at 10-15. This is inadequate, especially where, even with the limited information Defendants have provided, it is clear that many of these records contain factual information. *See, e.g.,* Dkt. 28-4 at 10 (USCIS draft document of Asylum Facts and Stats; Credible Fear Training for USBP Plan dated May 1, 2019, including "Information about how many CBP employees will receive training and descriptions about the training CBP officers will receive."); Dkt. 28-3 at 45 (Draft Briefing Memo titled "CBP Migration Statistics – Fiscal Year 2019 Year to Date."). Thus, even assuming some portions of these records are properly withheld under Exemption 5, Defendants have failed to show that they properly withheld *all* of these records. *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 27 (finding "boilerplate, conclusory language to describe [the agency's] efforts to segregate nonexempt, factual material from exempt material" inadequate to withhold).

* * *

For the foregoing reasons, Plaintiffs maintain that Defendants USCIS and DHS have failed to show that they challenged records were properly withheld and asks the Court to order their production. If the Court is not prepared to order disclosure of the withheld documents, it should review those withholdings *in camera* to determine whether they satisfy the criteria for properly withholding under Exemption 5. *See Pub. Emps. for Env't Resp.*, 288 F. Supp. 3d at 22 ("In conducting its review, a court may also rely on its own *in camera* examination of disputed documents to determine whether they were properly withheld under the claimed statutory exemptions."). The limited number of documents at issue make *in camera* review a preferred option if the Court has remaining questions regarding the propriety of Defendants' withholdings.

*See Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 42 (D.D.C. 2019) (finding that "'*in camera* inspection may be particularly appropriate . . . when the number of withheld documents is relatively small.'") (quoting *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (internal quotations omitted)).

### C.      Defendants Improperly Withheld Records under Exemptions 6 and 7(c)

An agency may apply Exemption 6 to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). When applying the exemption, the court must balance the "privacy interest that would be compromised by disclosure against any public interest in the requested information." *Multi AG Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). The D.C. Circuit has emphasized that "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Id*. at 1227 (internal quotation omitted). Where the agency cannot meet the first prong by demonstrating that the redacted information is "personnel, medical, or similar files," the query ends and Exemption 6 does not apply. *Schonberger v. Nat'l Transp. Safety Bd.*, 508 F. Supp. 941, 942 (D.D.C. 1981). When there is a privacy interest at stake, the court will then examine the public interest to determine if it outweighs the privacy interest and the information should be disclosed. *Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994).

Exemption 7(C) may exempt information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The threshold inquiry in determining the propriety of a 7(C) exemption is whether the records were compiled for law enforcement purposes. *FBI v. Abramson*, 456 U.S. 615, 622 (1982). If the records were compiled for law enforcement

purposes, the court may then consider whether release of the information would "constitute an unwarranted invasion of privacy." *Id.* If the privacy interest is "nontrivial," the requester must demonstrate that the public interest in the records is "significant" and the disclosure is likely to advance that interest. *Tuffly v. DHS*, 870 F.3d 1086, 1092-1093 (9th Cir. 2017) (internal quotations omitted). As with Exemption (b)(6), the court must then balance the privacy interest against the public interest. *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011); *see Families for Freedom v. CBP*, 797 F. Supp. 2d 375, 398-99 (S.D.N.Y. 2011) (holding public interest in understanding whether the expectations and requirements articulated in a memoranda reflect high-level agency policy outweighed privacy interest in names of government officials; officials' names, "not phone numbers or other more intrusive categories of personal information," were sought by requesters).

With regard to Exemption (b)(6), Plaintiffs note as an initial matter that they seek only the withheld names of CBP officers and do not seek other information, such as home or email addresses or phone numbers, for these individuals. *See* Winger Decl. ¶ 6, Exh. D. The Court should find that the mere release of names in this context is *not* encompassed by the prohibition on the release of information relating to "personnel, medical, or similar files," where the names appear in the course of employment duties. *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008); *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005). Here, the records relate to the Border Patrol agents assigned to adjudicate asylum screenings; thus, these officers stood in the same posture as the asylum officers, whose names were not redacted, for purposes of this threshold query. *See* Winger Decl. ¶ 6, Exh. D (listing the names and email addresses for approximately thirty USCIS asylum officers).

While Plaintiffs do not concede that this record related to the adjudication of threshold asylum screening is compiled for law enforcement purposes,[6] even if the Court concludes that the names of Border Patrol agents constitute the type of record properly captured in the threshold queries of Exemptions (b)(6) and (b)(7)(C), the release of this information does not trigger either an "unwarranted invasion of privacy," as contemplated under (b)(6), nor cannot it "reasonably be expected to constitute an unwarranted invasion of personal privacy," as encompassed by (b)(7)(C). The Supreme Court has noted that the more generous standard for protecting privacy attaches to Exemption (b)(7)(C), but Plaintiffs urge that even under a more generous standard, the minimal privacy interest implicated in this case cannot outweigh the significant public interest in the release of the Border Patrol agents' names. *See Roth v. DOJ*, 642 F.3d 1161, 1181 (D.C. Cir. 2011) (public interest in knowing whether FBI refused to disclose exonerating information to death row inmate outweighed privacy interests of men potentially inculpated in a crime). Further, especially given the nature of the government program at issue here, which was deemed likely unlawful by a federal court, the Court should construe the exemptions narrowly in favor of disclosure. *See DOJ v. Landano,* 508 U.S. 165, 181 (1993) (citations omitted).

---

[6] Defendants argue that the Court should presume that records containing the names of Border Patrol agents are protected under this exemption because the agencies were performing law enforcement functions in creating these records. Dkt. 28-1 at 19. No such presumption is warranted here, where Border Patrol agents – employed and trained by a law enforcement agency –were performing duties that encompass the adjudication of asylum claims, a humanitarian form of immigration relief, which is *not* a law enforcement function. *A.B.-B.*, 2020 WL 5107548, at *7 (explaining that "DHS regulations and [US]CIS guidelines . . . require that asylum interviews be nonadversarial proceedings with a neutral decision-maker.") (citing 8 C.F.R. § 208.30(d)); *but see Gosen v. USCIS*, 75 F.Supp.3d 279, 289 (D.D.C. 2014) (holding USCIS asylum officers may act as law enforcement officers). Moreover, as noted above, Defendant USCIS *did* release the names and email addresses of USCIS asylum officers, substantially undermining its claim that the agency considers this record to be compiled for law enforcement purposes. *See* Winger Decl. ¶ 6, Exh. D (listing the names and email addresses for approximately thirty USCIS asylum officers).

The privacy interest at issue here is "de minimus." *Multi AG Media*, 515 F.3d at 1229-30. The mere release of a name in this context does not implicate "intimate and potentially embarrassing information." *Painting & Drywall Work Pres. Fund, Inc. v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991). Moreover, while Defendants raise general claims of "harm" or "harassment" that might befall government employees if names are released, they point to no concrete examples that such harm or harassment would indeed ensue from the release of names. *See also* Fluharty Dec. ¶ 13 (pointing to no evidence that asylum seekers have harmed or threatened their interviewers); *Nat'l Ass'n of Ret. Fed. Emps. v. Horner,* 879 F.2d 873, 878 (D.C. Cir. 1989) (requiring "a causal relationship between the disclosure and the threatened invasion of privacy") (citations omitted); *see also Hall v. DOJ*, 552 F. Supp. 2d 23, 30 (D.D.C. 2008).

The significant interest of the public, including advocates, practitioners, and asylum seekers potentially subjected to the pilot program, in knowing whether the officer who conducted a credible fear interview was a Border Patrol officer outweighs the minimal privacy interest is this case. Defendants specifically prevented asylum seekers and their attorneys from learning whether or not their interviewer was a true USCIS asylum officer or a poorly trained Border Patrol agent. Fluharty Decl. at ¶ 11; O'Toole, *Border Patrol Agents*. The practice of assigning Border Patrol agents officers to conduct these key threshold screenings – of an extreme and consequential nature – concretely harmed asylum seekers, who faced summary removal as a consequence of receiving a negative threshold screening. Fluharty Decl. at ¶¶ 6; 12: 19; 22-24. As a threshold matter, Border Patrol agents were more likely to enter a negative credible fear determination than a properly trained asylum officer. *See* O'Toole, *Border Patrol Agents;* Winger Decl. ¶ 6, Exh. C, CBP Activity Summary to Date, Nov. 19, 2019; *see also* Fluharty Decl. ¶ 6.  Moreover, asylum seekers and their attorneys reported mistreatment, including Border

Patrol agents telling asylum seekers who had suffered sexual violence "…that what occurred to them was their fault." Fluharty Decl. ¶ 12; *see also* ¶ 19 (describing aggressive interrogation and failing to accurately record testimony). The conduct of Border Patrol agents in implementing this pilot program increases the public interest in disclosure. *See Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 675-76 (D.C. Cir. 2016) (noting the public interest in misconduct by immigration judges).

 Asylum seekers cannot seek a remedy for this harm – and advocates and the public cannot understand the full scope of who was injured by the program – unless asylum seekers can confirm that their interviewer was a Border Patrol agent. Fluharty Decl. ¶¶ 22-24; *see ACLU*, 655 F.3d at 14 ("[P]laintiffs are not (or at least not only) seeking to show that the government's tracking policy is legally improper, but rather to show what that policy is and how effective or intrusive it is."). As Ms. Fluharty outlines, if an asylum seeker can confirm that he or she was interviewed by a Border Patrol agent this will assist attorneys in filing motions for reconsiderations of negative screening determinations, Fluharty Decl. ¶ 22, as well as help impacted asylum seekers challenge expedited removal orders as a result of a negative screening determination and avoid the negative consequences of these removal orders, *id.* ¶¶ 23-24.  This includes individuals who may have been physically removed erroneously as well as individuals who remain in the country under electronic monitoring. *Id*. Plaintiffs therefore urge the Court that in the context of this unprecedented governmental program, given the stakes at play and the ongoing consequences of this government operation, the public interest in release of Border Patrol agent names is at its apex and the release of this information is warranted in these circumstances. *See Butler v. DOJ*, CIV. A. No. 86–2255 HHG, 1994 WL 55621, at *5 (D.D.C.

Feb. 3, 1994) ("The public interest in seeing that [an individual's] due process rights are protecting . . . is significant.").

V.    **CONCLUSION**

For these reasons, the Court should deny Defendants' motion for summary judgment, grant summary judgment to Plaintiffs, order Defendant CBP to conduct an adequate search, and compel the production of the narrowed list of records that are the subject of Plaintiffs' current challenge.

Respectfully submitted,

Dated: June 18, 2021

*/s/ Emma Winger*
Emma Winger (Admitted *Pro Hac Vice*)
American Immigration Council
1331 G Street, NW, Suite 200
Washington, DC 20005
(617) 505-5375
ewinger@immcouncil.org

Claudia Valenzuela (D.C. Bar No. IL0056)
Immigrant Legal Defense
1322 Webster Street, Suite 300
Oakland, CA 94612
(872) 256-1979
claudia@ild.org
*Attorneys for Plaintiffs*