**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| AMERICAN IMMIGRATION COUNCIL, *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-2965 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 28, 29 |
| | : | | |
| U.S. CUSTOMS AND BORDER PATROL, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

## I. INTRODUCTION

Plaintiffs American Immigration Council and Tahirih Justice Center filed this suit to

require Defendants the Department of Homeland Security ("DHS"), U.S. Citizenship and

Immigration Services ("USCIS"), and U.S. Customs and Border Protection ("CBP") to respond

appropriately to Plaintiffs' Freedom of Information Act ("FOIA") requests.  The requests

concern a program for using CBP agents to conduct credible fear interviews, which is a part of

the asylum-seeking process.  At issue are the sufficiency of CBP's search and the propriety of

several withholdings by DHS and USCIS under Exemptions 5, 6, and 7(C).  As explained below,

CBP's search was insufficient, more detail would be required to justify the Exemption 5

withholdings, and the Exemptions 6 and 7(C) withholdings are improper.  Accordingly, the

Court orders CBP to conduct an appropriate search, denies Plaintiffs' and Defendants' motions

without prejudice regarding the Exemption 5 withholdings to give Defendants an opportunity to

address deficiencies, and grants Plaintiffs' motion regarding the Exemption 6 and 7(C)

withholdings.  The parties are ordered to submit a proposed schedule for further proceedings

within two weeks of the issuance of this opinion.  *See Jud. Watch, Inc. v. U.S. Dep't of Just.*, No.

CV 17-0832 (CKK), 2019 WL 4644029, at *9 (D.D.C. Sept. 24, 2019) (taking a similar

procedural approach).

## II.  BACKGROUND[1]

Credible fear interviews are a step in the asylum process where "asylum officer[s]"

determine whether "an alien has a credible fear of persecution."  8 U.S.C.A. § 1225(b)(1)(A)(ii),

(B)(ii).  Beginning in the spring of 2019, Defendants "began a pilot program in which U.S.

Border Patrol agents received training to conduct, and subsequently did conduct, credible fear

interviews."  Defs.' Resp. to Pls.' Statement of Material Facts ("Defs.' SUMF Resp.") ¶ 1, ECF

No. 33-1.  Credible fear interviews were traditionally conducted by USCIS officers and—

according to at least some evidence presented by Plaintiffs—the CBP officers found credible fear

at a lower rate than the USCIS asylum officers.  *See* Mem. P. & A. Supp. Pls.' Cross-Mot.

Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n & Mem.") at 2–5, ECF Nos. 29-2, 30

(citing, among others, Molly O'Toole, *Border Patrol Agents, Rather than Asylum Officers,

Interviewing Families for 'Credible Fear,'* L.A. Times (Sept. 19, 2019, 5:50 AM),

https://www.latimes.com/politics/story/2019-09-19/border-patrol-interview-migrant-families-

credible-fear).  At least some CBP officers conducting credible fear interviews were instructed

not to inform the asylum seekers, or their attorneys, that they were CBP officers, and would not

clarify when asked.  Defs.' SUMF Resp. ¶ 3 (undisputed).  On August 31, 2020, Judge Leon

---

[1] This section represents the Court's best understanding of the undisputed facts based on
its review of the filings and record, unless noted otherwise.

granted a preliminary injunction against Defendants' heads preventing them from "permitting U.S. Customs and Border Protection agents to conduct asylum interviews or make credible fear determinations, pending a ruling on the merits in this case," because plaintiffs were likely to succeed on their claim that using "CBP agents who receive substantially less training than [USCIS] asylum officers to conduct asylum interviews violates the Immigration and Nationality Act." Order, *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL) (D.D.C. Aug. 31, 2020), ECF No. 33; *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548, at *1 (D.D.C. Aug. 31, 2020).

In May, July, and August 2019, Plaintiffs submitted FOIA requests to Defendants for records regarding CBP officers conducting credible fear interviews, to which Defendants initially did not substantively respond. Defs.' SUMF Resp. ¶¶ 5–9. Plaintiffs filed their complaint on October 2, 2019. *Id.* ¶ 10. The parties then engaged in discussions resulting in Plaintiffs submitting a list of seven priority categories of documents (narrowed to include only final versions, with Plaintiffs' rights reserved to later seek non-final versions). *Id.* ¶¶ 11, 13. The categories include:

1. any memorandum of understanding between CBP, USCIS and/or DHS regarding the use of CBP officers to conduct credible fear interviews (CFIs) and/or reasonable fear interviews (RFIs);

2. any written lesson plans, any curricula, and any training materials provided to CBP officers;

3. protocols or policies for evaluating whether a CBP officer may conduct these interviews, including materials used to evaluate and test CBP officers with respect to their training and/or ability to conduct CFIs or RFIs, excluding the results of any testing or evaluation of individual officers;

4.   protocols or policies addressing how CBP officers will be supervised in

conducting CFIs or RFIs and making credible and reasonable fear determinations;

5.   any written policy directives, written policy guidelines, or written procedures

concerning the expansion of the pilot program that reportedly trained

approximately 60 CBP officers to conduct CFIs or RFIs;

6.   any written communications from DHS, CBP, or USCIS Headquarters to CBP or

USCIS personnel about CBP conducting CFIs or RFIs; and

7.   any existing reports showing grant/denial rates for CFIs/RFIs conducted by CBP

officers.

*Id.* ¶ 12.  Defendants conducted searches and located responsive documents, some of which were

produced in full, some of which were produced after redaction, and some of which were

withheld in full.  *See id.* ¶¶ 14–19.  CBP searched for documents in only categories 1 and 5.  *Id.*

¶ 19.

Defendants moved for summary judgment that the agencies conducted reasonable

searches and properly withheld information under FOIA Exemptions 5, 6, 7(C), and 7(E).  Defs.'

Mem. P. & A. Supp. Defs.' Mot. Summ J. ("Defs.' Mem.") at 1, ECF No. 28-1.[2]  Plaintiffs

opposed and cross-moved for summary judgment that CBP did not conduct a reasonable search

and that DHS and USCIS did not properly withhold certain records and information.  Pls.' Opp'n

& Mem. at 2.  The motions are fully briefed.  *See* Defs.' Reply Mem. Supp. Defs.' Mot. Summ.

J. & Resp. Opp'n Pls.' Cross-Mot. Summ. J. ("Defs.' Reply & Opp'n"), ECF Nos. 33, 34; Reply

Mem. Supp. Pls.' Cross-Mot. Summ. J. ("Pls.' Reply"), ECF No. 35.

---

[2] However, the only references to Exemption 7(E) were in introductory paragraphs.

### III.  LEGAL STANDARD

The purpose of FOIA "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA was intended "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks omitted).  FOIA requests thus provide individuals with the opportunity to obtain access to federal agency records, except to the extent that such records are protected from public disclosure by one of nine exemptions.  *See* 5 U.S.C. § 552(a)(3), (a)(4)(B), (b), (c); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975); *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see, e.g.*, *Alyeska Pipeline Serv. Co. v. U.S. EPA*, 856 F.2d 309, 314 (D.C. Cir. 1988) (concluding that unsubstantiated claims of factual controversies cannot defeat a summary judgment decision in a FOIA case).  FOIA cases are typically resolved through summary judgment because in FOIA cases there is rarely any factual dispute; instead, these cases center on how the law is applied to the records at issue.  *See Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017) ("FOIA cases typically and appropriately are decided on motions for summary judgment." (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009))); *see also Gray v. Southwest Airlines Inc.*, 33 F. App'x 865, 868 n.1 (9th Cir. 2002) (citing *Schiffer v. FBI*, 78 F.3d 1405, 1409 (9th Cir. 1996)).  Accordingly, in a FOIA suit, an agency is entitled to

summary judgment "if no material facts are genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" *Prop. of the People, Inc. v. Off. of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)).  "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

In a FOIA suit, the court shall determine a motion for summary judgment de novo.  *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 179 (D.D.C. 2013).  Therefore, when assessing non-disclosure decisions in a FOIA action, the court may rely solely on "affidavits or declarations if they describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Life Extension Found.*, 915 F. Supp. 2d at 179 (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Pronin v. Fed. Bureau of Prisons*, No. 17-cv-1807, 2019 WL 1003598, at *3 (D.D.C. Mar. 1, 2019).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. Cent. Intel. Agency*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (internal citations

omitted)).  However, exemptions are to be "narrowly construed," and "conclusory and generalized allegations of exemptions are unacceptable."  *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 50 (D.D.C. 2019) (quoting *Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007)); *Prop. of the People, Inc.*, 330 F. Supp. 3d at 380 (quoting *Morley*, 508 F.3d at 1114–15).  Accordingly, an agency must do more than provide "summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information.'"  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 221 (D.C. Cir. 1987)).  "When an agency invokes an exemption, it must submit affidavits that provide the kind of detailed, scrupulous description of the withheld documents that enables a District Court judge to perform a de novo review."  *Tokar v. U.S. Dep't of Just.*, 304 F. Supp. 3d 81, 89 (D.D.C. 2018) (cleaned up).

## IV.  ANALYSIS

In Plaintiffs' combined opening memorandum and opposition, Plaintiffs state that "[t]he following issues and records are currently in dispute": adequacy of CBP's search; USCIS's deliberative process withholdings of six records; DHS's deliberative process withholdings of six records; DHS's deliberative process and attorney-client privilege withholdings of one record; and USCIS's withholding of the names of CBP officers in an email.  Pls.' Mem. & Opp'n at 10–11.  Plaintiffs subsequently withdrew their challenges to three DHS withholdings: two of the six records withheld under the deliberative process privilege alone, and the one record withheld under both deliberative process and attorney-client privileges.  Pls.' Reply at 6.

But Defendants' motion goes beyond these remaining issues.  For example, Defendants argue that they properly withheld the document given Bates numbers DHS-001-0973-3672 to -3676 based on deliberative process and attorney-client privilege.  Defs.' Mem. at 13.  This

document is described in the first DHS declaration as "Draft Memorandum of Agreement between CBP and USCIS; final agreement dated July 10, 2019." 2d Pavlik-Keenan Decl. at 54, ECF No. 28-3. This is not one of the documents called out in Plaintiffs' list, and Plaintiffs do not appear to discuss this document in their combined opposition and cross-motion. To the extent that Defendants seek summary judgment beyond the issues identified by Plaintiffs as being "currently in dispute," it is granted as conceded by Plaintiffs' statement that they are not in dispute.

The remaining issues are (1) the adequacy of CBP's search; (2) DHS's deliberative process withholdings of four records; (3) USCIS's deliberative process withholdings of six records; and (4) USCIS's withholding of the names of CBP officers in an email. For the reasons given below, the Court holds that Plaintiffs' motion is granted regarding CBP's search, Plaintiffs' and Defendants' motions are denied without prejudice regarding the deliberative process withholdings, and Plaintiffs' motion is granted regarding the CBP officer names.

## A. CBP's Search

Both sides move for summary judgment on the adequacy of CBP's search. They dispute (1) whether CBP should have searched for additional categories of documents rather than relying on other agencies to handle those categories, and (2) whether CBP's description of the search it did conduct is adequate. For the reasons given below, Defendants' motion is denied and Plaintiffs' motion is granted on this issue.

"An agency fulfills its obligations under FOIA to conduct an adequate search 'if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents.'" *Canning v. U.S. Dep't of State*, 346 F. Supp. 3d 1, 13 (D.D.C. 2018) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal

citation and quotations marks omitted)); *see also Morley*, 508 F.3d at 1114.  For a search to be reasonably calculated to uncover all relevant documents, the agency does not need to search "every record system" for the requested documents.  *Marino v. Dep't of Just.*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  Nor must the agency's search be perfect.  *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).  But the agency must show that it "conduct[ed] a good faith, reasonable search of those systems of records likely to possess the requested records."  *Pinson v. U.S. Dep't of Just.*, 177 F. Supp. 3d 56, 80 (D.D.C. 2016) (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)); *see also Oglesby*, 920 F.2d at 68.  An agency "cannot limit its search to only [some] record system[s] if there are others that are likely to turn up the information requested."  *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 891 (D.C. Cir. 1995) (quoting *Oglesby*, 920 F.2d at 68).

"To prevail on summary judgment, the agency must submit declarations that 'denote which files were searched, [and] by whom those files were searched, and [that] reflect a systematic approach to document location.'"  *Canning*, 346 F. Supp. 3d at 14 (quoting *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (internal citation and quotation marks omitted)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006); *Steinberg v. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994); *Oglesby*, 920 F.2d at 68.  Once the agency has provided a "relatively detailed" declaration describing its search, the burden shifts to the FOIA requester to produce "countervailing evidence" suggesting that a genuine dispute of material fact exists as to the adequacy of the search.  *Morley*, 508 F.3d at 1116 (internal quotation marks omitted).  An agency's declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative

claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).  However, if the record raises substantial doubts regarding the agency's efforts, "particularly in view of well[-]defined requests and positive indications of overlooked materials," then summary judgment is not appropriate.  *Valencia-Lucena*, 180 F.3d at 326 (internal quotations and citations omitted).

The first issue is whether CBP should have conducted its own search for items 2–4 and 6–7 on the expedited list.  According to Defendants, CBP did not search for those documents because, after "consult[ing] with the individuals most knowledgeable about the potentially responsive records[,] . . . CBP determined that . . . DHS and USCIS were the likely custodians for categories 2–4 and 6–7."  Defs.' Mem. at 7.  Defendants argue that this makes sense because "CBP had a limited role—to solely provide personnel to USCIS"—citing a Memorandum of Agreement between CBP and USCIS for support of that limited role.  Defs.' Reply & Opp'n at 2.

Plaintiffs disagree, arguing that Defendants did not explain how CBP made this determination nor why this determination excused CBP from its responsibility to search.  Pls.' Reply at 3–5.  Regarding CBP's supposed "limited role," Plaintiffs point to language in the Memorandum of Agreement appearing to describe more involvement by CBP.  For example, the Memorandum "calls for 'collaboration' between CBP and USCIS and provides that USCIS will provide feedback to CBP regarding the performance of Border Patrol agents upon request."  *Id.* at 3.  It also requires CBP to ensure that its agents are not exercising their law enforcement authorities while on the assignment and, upon USCIS's request, reassign CBP agents who are not performing interviews at an acceptable level of competence.  *Id.* at 3–4.  Plaintiffs also highlight facts from one of the DHS declarations—and its attached *Vaughn* indices—suggesting that CBP

had a more central role in the pilot.  *See, e.g., id.* at 4 (citing DHS's statement that "CBP has confirmed" the date of the most recent working version of an issue paper despite DHS not discovering the recent version in its search).

Defendants have not "demonstrate[d] beyond material doubt that [their] search was reasonably calculated to uncover all relevant documents.'"  *Canning*, 346 F. Supp. 3d at 13 (quoting *Valencia-Lucena*, 180 F.3d at 325 (internal citation and quotations marks omitted)).  Although CBP may ultimately lack responsive documents for categories 2–4 and 6–7, Plaintiffs have raised substantial doubts about whether that is the case.  This is not a case of requesting documents from an agency that is clearly unrelated to the subject matter.  By providing the personnel alone, CBP played a facially nontrivial role in this program.  Defendants have not provided sufficient evidence demonstrating that CBP's role was so limited such that failing to have CBP search for categories 2–4 and 6–7 could be reasonably calculated to uncover all relevant documents.  *See Davidson v. U.S. Dep't of State*, 206 F. Supp. 3d 178, 191 (D.D.C. 2016) (explaining that "bald statements" that "do not *explain* why no other record system was likely to produce responsive documents," such as statements that "no other offices or records systems were reasonably likely to maintain [responsive] document," are insufficient), *aff'd*, 728 F. App'x 7 (D.C. Cir. 2018).  The declaration provided by the Branch Chief of the CBP FOIA Division does not even state that "the CBP subject matter experts most knowledgeable of the program" affirmatively opined that CBP was unlikely to have responsive records.  Howard Decl. ¶ 7, ECF No. 28-5 (stating that CBP subject matter experts "were consulted on the scope of the expedited search" and that "consideration was given as to which of the three Defendants would be reasonably likely to have the requested documents within its custody," but not stating that, or explaining why, CBP was unlikely to have responsive records).  Defendants cannot limit their

search without, "[a]t the very least, . . . explain[ing] in [their] affidavit that no other record system was likely to produce responsive documents." *Oglesby*, 920 F.2d at 68; *see also id.* (explaining that it is insufficient to search only the "record system most likely to contain the information" without demonstrating that such a search "was reasonably calculated to uncover all relevant documents"); *DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015) ("'[M]ost likely' is not the relevant metric"). And even if CBP's headquarters personnel may have limited responsive documents, CBP does not explain why the dozens of its personnel that took part in the program would not have responsive documents.

The second issue regarding CBP's search is whether the search was adequately described. Plaintiffs argue that Defendants barely describe CBP's search for documents in categories 1 and 5, which turned up only a single document for category 1 and nothing for category 5 despite CBP's participation in "a ground-breaking program that employed its officers." Pls.' Opp'n & Mem. at 14. Defendants argue that CBP's search was sufficient because it "rel[ied] on the employee with the relevant knowledge about the records at issue" by "identifying the subject matter expert" and having that "employee review[] the categories[] [and] determin[e] the location of responsive documents." Defs.' Reply & Opp'n at 3.

CBP's description of its search is insufficient. Category 5 covers "[a]ny written policy directives, written policy guidelines, or written procedures concerning the expansion of the pilot program that reportedly trained approximately 60 CBP officers to conduct CFIs or RFIs." Defs.' Mem. at 7. CBP's supplemental declaration gives the following explanation for its search (or lack thereof) for category 5: "CBP did not produce documents specified in paragraph 8(e), above, because expansion of the Pilot Program to include U.S. Customs and Border Protection officers post-dated the date upon which CBP initiated its search in the instant FOIA case."

Howard Suppl. Decl. ¶ 15, ECF No. 33-2.  But, as Plaintiffs argue, this explanation is insufficient on its face at least because records relating to an event may proceed that event.  *See* Pls.' Reply at 5.  It is not difficult to imagine "written procedures concerning the expansion of the pilot program" being drafted before any expansion itself took place, and Defendants have given no reason to suggest otherwise.

The supplemental declaration seems to state that no search for category 5 documents occurred via its oblique statement that "CBP did not produce documents."  Howard Suppl. Decl. ¶ 15.  To the extent that CBP did not search for category 5 documents, Defendants have not supported that decision, as explained above.  To the extent that CBP did search for category 5 documents, Defendants have not "submit[ted] declarations that 'denote which files were searched, [and] by whom those files were searched, and [that] reflect a systematic approach to document location.'"  *Canning*, 346 F. Supp. 3d at 14 (internal citation and quotation marks omitted) (quoting *Liberation Newspaper*, 80 F. Supp. 3d at 144).  To support its search, Defendants cite only one paragraph of the first Howard declaration beyond the paragraph from the supplemental declaration discussed above, which states that (1) "the CBP subject matter experts most knowledgeable of the program . . . were consulted on the scope of the expedited search"; (2) "consideration was given as to which of the three Defendants would be reasonably likely to have the requested documents within its custody, and which points of contacts within the agencies would be the likely custodian(s)"; (3) "CBP determined that it had no documents that were responsive to the fifth category"; and (4) CBP produced "the document responsive to the first category."  Howard Decl. ¶ 7.  These descriptions do not state which files were searched, state who performed the search, or describe a systematic approach.  *See Canning*, 346 F. Supp. 3d at 14.  They do not even clearly state that a search occurred, merely implying as much by

referencing consultations with subject matter experts, a determination that no documents were responsive to category 5, and CBP's location of one document for category 1. This is akin to stating in a conclusory fashion that the agency performed a "systematic search for records," which this Court has found insufficient. *Pinson v. U.S. Dep't of Just.*, 145 F. Supp. 3d 1, 12–13 (D.D.C. 2015).

Plaintiffs do not specifically call out category 1 in their reply brief as they did with category 5, but they objected to this search in their opening brief and it also appears insufficient. The relevant paragraph of the Howard declaration, as identified by Defendants, states that "CBP searched for and produced the July 10, 2019 MOA pursuant to the request for documents specified in paragraph 8(a), above." Howard Suppl. Decl. ¶ 11; *see* Defs.' Reply & Opp'n at 3 (citing paragraphs 10–17 of the supplemental Howard declaration as "describing CBP's search"). This does not state which files were searched, state who performed the search, or describe a systematic approach. *See Canning*, 346 F. Supp. 3d at 14. In fact, it is framed as stating that CBP searched for one specific document as opposed to searching for all documents responsive to the request, which asked for "[*a*]*ny* memorandum of understanding between CBP, USCIS and/or DHS regarding the use of CBP officers to conduct credible fear interviews (CFIs) and/or reasonable fear interviews (RFIs)." Howard Suppl. Decl. ¶ 8 (emphasis added). Perhaps CBP did search for "any" memorandum of understanding and located only the July 10, 2019 memorandum. But CBP would need to state that clearly as opposed to stating that CBP searched for merely the July 10, 2019 memorandum.

For the reasons given above, Plaintiffs have shown that CBP's search was insufficient as a matter of law. Plaintiffs' motion is therefore granted, and Defendants' motion is denied, on this ground. CBP is ordered to conduct a search reasonably calculated to uncover all relevant

14

documents from the expedited requests, and the parties are ordered to file a proposed schedule for further proceedings within two weeks of the issuance of this opinion.

## B. Exemption 5

Both sides move for summary judgment on specific withholdings under Exemption 5. For the reasons given below, the Court holds that Defendants have not adequately justified these withholdings. Plaintiffs' and Defendants' motions on this issue are denied without prejudice. Defendants are ordered to either supplement their *Vaughn* indices to justify these withholdings or release the documents, and the parties are ordered to file a proposed schedule for further proceedings within two weeks of the issuance of this opinion.

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court and the D.C. Circuit have construed Exemption 5 to exempt documents "normally privileged in the civil discovery context." *Sears*, 421 U.S. at 149; *see also Martin v. Office of Special Counsel*, 819 F.2d 1181, 1184 (D.C. Cir. 1987). Exemption 5 thus "'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant'—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege." *Brown v. Dep't of State*, 317 F. Supp. 3d 370, 376 (D.D.C. 2018) (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation marks and citation omitted)); *see also Baker & Hostetler LLP*, 473 F.3d at 321.

The government bears the burden of showing that a FOIA exemption applies. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021). The agency's burden as to privilege "does not shift even when the requester files a cross-motion for summary

judgment because 'the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure.'" *Hardy*, 243 F. Supp. 3d at 162 (cleaned up) (quoting *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05). To meet its burden, the agency must offer a "relatively detailed justification" of its application of the privilege. *Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). "[A]n agency may rely on detailed affidavits, declarations, a *Vaughn* index, in camera review, or a combination of these tools." *Elec. Frontier Found. v. Dep't of Just.*, 57 F. Supp. 3d 54, 59 (D.D.C. 2014) (quoting *Comptel v. FCC*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder*, 254 F. Supp. 3d at 140 (internal quotation marks omitted) (quoting *Jud. Watch, Inc.*, 715 F.3d at 941).

### 1.  Predecisional and Deliberative

The only privilege still at issue for these motions concerning Exemption 5 is the deliberative process privilege. The deliberative process privilege aims to "prevent injury to the quality of agency decisions." *Sears*, 421 U.S. at 151. The privilege protects the "decision making processes of government agencies and focus[es] on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* at 150 (cleaned up). It "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532

U.S. 1, 8–9 (2001) (citation omitted) (quoting *Sears*, 421 U.S. at 151).  This privilege aims to balance the merits of transparency against the concern that agencies will be "forced to operate in a fishbowl."  *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotation marks omitted).

For the deliberative process privilege to apply, the record must "bear on the formulation or exercise of agency policy-oriented *judgment*."  *Petroleum Info. Corp.*, 976 F.2d at 1435.  An agency typically cannot withhold "[p]urely factual material . . . unless it reflects an 'exercise of discretion and judgment calls.'"  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (quoting *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)).  The party invoking the privilege must establish that the record is both predecisional and deliberative.  *See Prop. of the People*, 330 F. Supp. 3d at 382.  "A document is predecisional if it was 'generated before the adoption of an agency policy.'"  *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  Although "the term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" it essentially means "that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue."  *Nat'l Sec. Archive v. Cent. Intelligence Agency*, 752 F.3d 460, 463 (D.C. Cir. 2014); *see also Reps. Comm. for Freedom of the Press*, 3 F.4th at 362 ("A document is deliberative when it is prepared to help the agency formulate its position and it reflects the give-and-take of the consultative process." (cleaned up)).  "[T]he agency invoking the deliberative process privilege must show (1) 'what deliberative process is involved,' and (2) 'the role played by the documents in issue in the course of that process,'" and "should also explain (3) the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document,' and (4) the 'relative positions in the

agency's chain of command occupied by the document's author and recipient.'" *Jud. Watch,*
*Inc.*, 20 F.4th at 54 (citation omitted) (quoting *Senate of the Com. of P.R. ex rel. Judiciary*
*Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987)).

### a.  DHS

The parties dispute DHS's withholding of four documents.  None of these withholdings
are currently justified.

"Issue paper regarding U.S. Border Patrol Credible Fear Program, dated May 16, 2019"
(DHS-001-0973-1739 to -1742).  DHS's supplemental declaration included with its combined
reply and opposition states that this document is "a non-final version of an issue paper," the
"most recent working version" of which is dated April 27, 2020.  3d Pavlik-Keenan Decl. at 8,
ECF No. 33-3.  It is an internal document with "comments highlighted in red and green
pertaining to the status of certain action items, including notations that certain items are still
pending."  *Id.*  DHS argues that disclosure of this document would be misleading and inhibit
candor among employees because it is not a final version.  *Id.*

Defendants argue that this document is deliberative because "it represents the give and
take of the consultative process between the agency employees" and predecisional because it is
"a draft of a final document."  Defs.' Mem. at 13; *see also* Defs.' Reply & Opp'n at 4–5 (arguing
that *Vaughn* index shows that document is deliberative because of "the nature of the discussions
and the discourse between agency employees" and predecisional because of "ongoing decision-
making about the pilot program and the processing of asylum seekers along the southern
border").  Plaintiffs argue that this document "post-dates the April 2019 decision to launch the
pilot program" and Defendants have not adequately identified the relevant deliberative process
nor the role played by this document in that process.  Pls.' Opp'n & Mem. at 20.  They

emphasize that if this document merely describes past decisions or "play[ed] no role in shaping agency policy," it is not eligible for deliberative process withholding. *Id.*

Defendants' description of this document and its role at DHS is insufficient to justify application of Exemption 5. "[A] 'broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional.'" *Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013)). The fact that the document is a non-final draft does not on its own demonstrate that the document is predecisional. Defendants do not identify what decision or policy this document was leading towards, or why it does not merely "embody or explain a policy that the agency adopt[ed]." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 362 (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021)); *see also id.* at 363 (explaining that documents may be predecisional if they are "part of an internal dialogue about critical judgment calls aimed at advancing the agency's interests" rather than "descriptive discussions"). Even if Defendants had shown that the document was predecisional, the non-final status of the document does not make the document per se deliberative. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982) ("Even if a document is a 'draft of what will become a final document,' the court must also ascertain 'whether the document is deliberative in nature.'" (quoting *Coastal States Gas Corp.*, 617 F.2d at 866)). And the details Defendants provide to support the non-final nature of the document—that it has "comments highlighted in red and green pertaining to the status of certain action items, including notations that certain items are still pending," 3d Pavlik-Keenan Decl. at 8—do not unambiguously reflect deliberation. Statuses of action items, without more, could be considered facts that do not

necessarily reflect any deliberation or give-and-take. *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 365–66 (explaining that even though "factual corrections" were predecisional because they were provided to be used in drafting a final report, they were not deliberative because no editorial judgment was exercised and the process "did not call for judgment or the candid exchange of ideas"). The document's characterization as an "issue paper" does not unambiguously characterize it as deliberative.

If Defendants continue to assert the deliberative process privilege over this document (and the others discussed herein), they must more clearly "show (1) 'what deliberative process is involved,' and (2) 'the role played by the documents in issue in the course of that process,'" and "should also explain (3) the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document,' and (4) the 'relative positions in the agency's chain of command occupied by the document's author and recipient.'" *Jud. Watch, Inc.*, 20 F.4th at 55 (citation omitted) (quoting *Senate of the Com. of P.R. ex rel. Judiciary Comm.*, 823 F.2d at 585–86). As part of this showing, Defendants must necessarily explain whether they assert that the document *contains* evidence of a deliberative process—for example, a policy documented therein or comments and highlighting about various statuses—or whether the document *reflects* a deliberative process—for example, the process of creating the document which may reveal editorial judgments. Defendants' briefing must leave the Court with a clear understanding of what deliberative process is asserted and the relationship between the document and that deliberative process.

"Draft Briefing Memo" (DHS-001-0973-2747 to -2770). DHS's supplemental declaration describes this document as a 24-page draft "briefing memo titled 'CBP Migration Statistics - Fiscal Year 2019 Year to Date.'" 3d Pavlik-Keenan Decl. at 9. It "contains a draft

water mark on all pages, is undated, and contains placeholders throughout for input from certain DHS employees." *Id.* It also has "redline edits and bubble comments throughout" and "reflects internal discussions between DHS employees, including information DHS may have determined was confidential and not appropriate for release." *Id.* DHS argues that disclosure of this document would be misleading and inhibit candor among employees because it is a draft and that, although there is "statistical information" in the document, it "is inextricably intertwined with deliberative and predecisional information." *Id.*

Defendants do not make any separate argument on behalf of this record aside from those discussed above regarding the issue paper. *See* Defs.' Mem. at 12–13; Defs.' Reply & Opp'n at 4–5. Plaintiffs also largely address these documents together, arguing that for both, "the agency relies entirely on the draft nature of the records to defend their withholding" and noting that there is insufficient information to determine whether this document post-dates the decision to launch the pilot program. Pls.' Opp'n & Mem. at 20.

Defendants' description of this document and its role at DHS is insufficient to justify withholding under Exemption 5. As with the issue paper above, Defendants do not describe what decision or policy this document was leading towards, nor the nature of any deliberations or give and take. If Defendants believe this document led to the beginning of the pilot program, they would need to at least provide evidence that it pre-dated the beginning of that program. Although the document has redline edits, comments, and internal discussions among employees, no detail is given about their nature. These could be of a non-deliberative nature, such as fixing mistakes, as opposed to the "back-and-forth exchange of ideas, constructive feedback, [or] internal debate." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 364.

"Draft Outline" (DHS-001-0973-2742 to -2746).  DHS's supplemental declaration

describes this document as "a 5 page working draft document with the heading unclassified/for

official use only/pre-decisional" that is titled "Department of Homeland Security, Strategy to

Address Crisis at the Southern Border, Draft Outline."  3d Pavlik-Keenan Decl. at 8.  It has "a

draft water mark on all pages."  *Id.*  DHS is not aware of this document being circulated as final

but cannot locate a final version.  *Id.*  DHS argues that disclosure of this document would be

misleading and inhibit candor among employees because it is not a final version.  *Id.*  The first

DHS declaration—but not the supplemental declaration—states that this document has portions

that were "not populated/left open for further input" and "reflects internal discussions between

DHS employee[s] how to address the crisis at the Southern Border, including information DHS

may have determined was confidential and not appropriate for release."  2d Pavlik-Keenan Decl.

at 45.

Defendants do not make any separate argument on behalf of this record aside from those

discussed above regarding the issue paper.  *See* Defs.' Mem. at 12–13; Defs.' Reply & Opp'n at

4–5.  Plaintiffs note that it is not clear whether this document "pre-dates any particular decision

or describes decisions already made."  Pls.' Opp'n & Mem. at 20–21.  As with the documents

above, Defendants do not describe what decision or policy this document was leading towards,

nor the nature of any deliberations or give and take.  The earlier declaration's statement that the

document "reflects internal discussions between DHS employee[s] how to address the crisis at

the Southern Border," 2d Pavlik-Keenan Decl. at 45, might have been sufficient to show that the

document was predecisional ("how to address the crisis at the Southern Border") and deliberative

("reflects internal discussions"), but that text appears to have been withdrawn in the subsequent

declaration, *see* Pls.' Reply at 8 ("Notably, with respect to [the draft outline], DHS' supplemental index includes *less* information about the substance of the record in dispute.").

"CBP meeting mk edits Clean v1.1" (DHS-001-0973-CBP-16 to -23).  DHS's supplemental declaration describes this document as "an internal DHS document entitled 'Issues for Discussion between CBP and USCIS,' which consists of 8 pages of confidential, internal communications pertaining to a number of immigration programs and initiatives."  3d Pavlik-Keenan Decl. at 11.  The supplemental declaration states that disclosure of this document would be misleading and inhibit candor among employees, though it does not state that this is because it is not a final version.  *Id.*  The supplemental declaration also states that "[r]elease of these topics of discussion would disclose deliberations concerning sensitive agency priorities."  *Id.*  However, the earlier declaration states that this document contains "*potential* topics of discussion between CBP and USCIS regarding a number of immigration programs and initiatives."  2d Pavlid-Keenan Decl. at 62 (emphasis added).

Defendants do not make any separate argument on behalf of this record aside from that discussed above regarding the issue paper.  *See* Defs.' Mem. at 12–13; Defs.' Reply & Opp'n at 4–5.  Plaintiffs argue that Defendants "provided almost no information at all" about this document and therefore failed to sufficiently describe the justification for exemption.  Pls.' Opp'n & Mem. at 21.  As with the documents above, Defendants do not describe what decision or policy this document was leading towards, nor the nature of any deliberations or give and take.  The earlier declaration's reference to "*potential* topics of discussion between CBP and USCIS," 2d Pavlid-Keenan Decl. at 62 (emphasis added), might have demonstrated both that the document was predecisional (have not yet decided on the topics) and deliberative (describing as "potential" implies that they are part of a give-and-take).  But this description appears to have

been withdrawn.  With the document described merely as "topics of discussion" and "internal communications pertaining to a number of immigration programs and initiatives," 3d Pavlik-Keenan Decl. at 11, it is not clear that this document is predecisional or deliberative.  *See Ecological Rts. Found. v. EPA*, No. CV 19-980 (BAH), 2021 WL 535725, at *23 (D.D.C. Feb. 13, 2021) (holding that agency did not show that a meeting agenda was predecisional or deliberative because it was unclear "whether the agenda precedes in time the final decision about which policy issues would be discussed at the . . . meeting"), *opinion vacated in part on reconsideration on other grounds*, 541 F. Supp. 3d 34 (D.D.C. 2021).  Although there is some authority suggesting that documents like this one that list topics to be discussed in the future are necessarily predecisional and deliberative, the Court declines to make such a holding without more targeted briefing.  *See, e.g.*, *Ctr. for Pub. Integrity v. Fed. Election Comm'n*, 332 F. Supp. 3d 174, 180 (D.D.C. 2018) ("A meeting agenda prepared before the meeting is necessarily predecisional and inherently deliberative in that staff are suggesting the topics to be discussed at the meeting.").

*b. USCIS*

The parties dispute USCIS's withholding of three groups of documents.  None of these withholdings are currently justified.

Three documents re: Credible Fear pilot program (Bates numbers 3–13).  USCIS's supplemental *Vaughn* index lists three documents in the same entry.  Two of these documents are described as versions of "[d]ocumentation about how the pilot program would work to include purpose, roles, responsibilities, training plan, workforce, and resources," that are dated April 17 and May 8, 2019.  USCIS Suppl. *Vaughn* Index at 3, ECF No. 33-4.  The third document is described as containing "[i]nformation about how many CBP employees will receive training

and descriptions about the training CBP officers will receive." *Id.*  For the "justification" of withholding these documents under Exemption 5, USCIS argues in its supplemental index that these documents contain "information shared during the deliberative process regarding development of the Credible Fear Task Force Pilot Program," the disclosure of which "would reveal the deliberative process used to evaluate the Pilot Program, the status of such an internal review, and the methods utilized to conduct such review." *Id.*  USCIS also argues that disclosure of these documents would have a chilling effect by "reveal[ing] how the CBP employees prioritized different facts, what they considered to be important, and other considerations in deliberating as to the continuation of the program." *Id.*

Defendants do not address these documents in their opening brief.  Defs.' Mem. at 15.  In their reply and opposition they argue that "the records at issue relate to USCIS' decision-making on the conduct of credible fear interviews on the southern border of the United States due [to] a surge in the number of noncitizens seeking asylum, which involved the use of CBP officers or agents to assist USCIS with credible fear interviews."  Defs.' Reply & Opp'n at 5.  Moreover, they argue that "the agencies' decision-making is ongoing," in part because this program is a pilot that is "part of a larger decision on how to handle noncitizens seeking asylum along the southern border." *Id.*  Plaintiffs respond that Defendants have "failed to identify the role these documents played in any deliberative process, where the descriptions strongly suggest that they are explaining actions to be taken in implementing an already established pilot program."  Pls.' Opp'n & Mem. at 18.

Defendants' description of these documents and their role at USCIS is insufficient to justify withholding under Exemption 5.  Defendants do not describe in sufficient detail what decision or policy these documents were leading towards, nor the nature of any deliberations or

give and take.  USCIS's supplemental *Vaughn* index references "the deliberative process

regarding development of the Credible Fear Task Force Pilot Program" and "deliberating as to

the continuation of the program," USCIS Suppl. *Vaughn* Index at 3, but Defendants have not

clarified what role these documents played in any deliberative process leading to those decisions.

There is no indication of whether the two documents describing how the pilot program would

work ended up being adopted by the agency, in which case they would not necessarily continue

to be predecisional.  *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 362.  The same goes

for the document containing information about how many CBP employees will receive training

and what that training will entail.  It is similarly unclear whether these documents were

deliberative.  There is no description of how these documents were used in any deliberative

process, such as being part of the "back-and-forth exchange of ideas, constructive feedback, [or]

internal debate."  *Id.* at 364.  The index's perfunctory statement that "disclosure of this draft

would reveal the deliberative process" is insufficient.  *See id.* at 361 ("In ruling on summary

judgment, courts may rely on *non-conclusory* agency affidavits demonstrating the basis for

withholding if they are not contradicted . . . ." (emphasis added)).  Additionally, it is not clear

how, based on the index's descriptions of the documents, these documents could "reveal the

deliberative process used to *evaluate* the Pilot Program, the status of such an internal review, and

the methods utilized to conduct such review."  USCIS Suppl. *Vaughn* Index at 3 (emphasis

added).  The documents are described as documenting how the pilot program, including its

training, would work; there is no indication that they contain the drafters' impressions or

evaluations of the program.  *See id.*  The other justification for Exemption 5—that disclosure

would reveal how CBP employees valued different priorities or facts—does not itself bear on

whether the documents are predecisional or deliberative.  Disclosing final agency policy also reveals an agency's priorities.

"USCIS draft document of Asylum Facts and Stats as of July 15, 2019" (Bates numbers 1–2).  USCIS's supplemental *Vaughn* index justifies the withholding of this document by describing its contents as "pre-decisional deliberative information between the USCIS Office of the director and staff employees who are working on developing talking points with respect to asylum facts and stats."  USCIS Suppl. *Vaughn* Index at 2.  It states that the document's information "is not finalized and does not accurately reflect any final agency statistics," and that it is a non-final draft "prepared in response to a Director's Office tasking for information and clarification that can ultimately be provided to the public."  *Id.*  USCIS emphasizes that disclosing this document would chill candid and frank discussions.  *Id.*

Defendants make the same arguments for all documents at issue here.  They argue that this draft document "is deliberative, in that it represents the give and take consultative process between USCIS employees about the draft document, and is pre-decisional, in that, as a draft document, it is antecedent to any decisions by USCIS."  Defs.' Mem. at 15.  And, as explained above regarding the argument in their reply and opposition, they argue that "the records at issue relate to USCIS' decision-making on the conduct of credible fear interviews on the southern border of the United States due [to] a surge in the number of noncitizens seeking asylum, which involved the use of CBP officers or agents to assist USCIS with credible fear interviews."  Defs.' Reply & Opp'n at 5.  Moreover, they argue that "the agencies' decision-making is ongoing," in part because this program is a pilot that is "part of a larger decision on how to handle noncitizens seeking asylum along the southern border."  *Id.*

Plaintiffs argue that Defendants "fail[] to identify the deliberative process at issue" by not identifying an agency policy it worked towards, noting that its July 2019 date post-dates the decision to implement the pilot.  Pls.' Opp'n & Mem. at 18.  Plaintiffs also highlight the nature of the document—containing "Facts and Stats"—to argue that it is not deliberative.  *Id.*; *see Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt.").  Last, Plaintiffs again note that drafts do not per se meet the deliberative process privilege.  Pls.' Opp'n & Mem. at 18.

Defendants' description of this document and its role at USCIS is insufficient to justify withholding under Exemption 5.  There may be sufficient information provided to show that this document is predecisional.  The supplemental *Vaughn* index states that this document contains "information between the USCIS Office of the director and staff employees who are working on developing talking points with respect to asylum facts and stats."  USCIS Suppl. *Vaughn* Index at 2.  The document therefore appears to be working towards a final decision about what to include in a set of talking points and was therefore "generated before the adoption of an agency policy."  *Jud. Watch, Inc.*, 20 F.4th at 54 (quoting *Coastal States Gas Corp.*, 617 F.2d at 866).  Plaintiffs' argument that this document is not predecisional because it post-dates the decision to implement the pilot program, Pls.' Opp'n & Mem. at 18, is irrelevant because Defendants identify a different decision: finalizing talking points.  Although, as noted above, it would also be necessary to foreclose the possibility that this document became the final document; Defendants do not state in their briefs or *Vaughn* indices whether a version of this document was "ultimately . . . provided to the public."  USCIS Suppl. *Vaughn* Index at 2.

Regardless, Defendants do not describe how this document was deliberative.  There is no description of any give and take or consultation.  The document is described as being "prepared in response to a Director's Office tasking for information and clarification that can ultimately be provided to the public."  USCIS Suppl. *Vaughn* Index at 2.  But this description could cover a simple request for factual information and statistics.  "While the fact/opinion distinction is not a wooden rule, it is a 'rough guide' for sifting out non-deliberative factual content from deliberative policy judgments."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 365 (quoting *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991)).  Based on the description provided, it does not appear that disclosure of this document would "*inevitably* reveal the government's deliberations." *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010) (emphasis added) (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)).  The Court does not doubt that a document of this kind—facts and statistics provided at the request of the USCIS Office of the Director to assist development of talking points regarding asylum facts and statistics—could reveal the give and take of the consultative process.  For example, if the requestor requested the most important facts and statistics relevant to asylum requests or requested the facts and statistics that best show some policy in a favorable light, disclosing the document would reveal the agency's deliberative process.  *See Ecological Rts. Found.*, 2021 WL 535725, at *15 ("At least two circuits, and the overwhelming majority of Judges on this Court, have thus concluded that an agency's consideration of what information to present to external parties and how to present it is a decision in itself, distinct from the underlying policy decision that is the subject of any anticipated communication, and thus can qualify a record of such consideration for exemption under the deliberative process privilege."); *id.* at *17 ("[A] set of talking points or similar document, even if focused on an agency's external

presentation of a past policy decision, *may* fall within the scope of the deliberative process privilege."); *see also id.* at *15 n.8 (collecting cases); *Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 392 F. Supp. 3d 100, 106 (D.D.C. 2019) ("[M]any times courts in this Circuit have found that the privilege applies to agency deliberations about future public statements, including talking points," but "that protection is not categorical" and the "key" is "context."). But insufficient information has been provided by Defendants for the Court to discern the relevant deliberative process and this document's role in it. *See Ecological Rts. Found.*, 2021 WL 535725, at *17 (explaining that, although talking points may be "predecisional as to what is ultimately communicated . . . and deliberative because they reveal the decision-making among staff," the agency's obligation to show that each record reflects deliberations meeting the exemption remains (cleaned up)).

Draft response to media inquiry and draft talking points (Bates numbers 15–22, 26–27). USCIS's supplemental *Vaughn* index describes the first document as a "[d]raft response to a media inquiry about a USCIS pilot program to train US Border Patrol Agents about how to conduct credible fear interviews" and the second document as "[d]raft talking points for the USCIS Director to present about the assistance CBP agents in the Los Angeles Asylum Office are providing to help with credible fear interviews." USCIS Suppl. *Vaughn* Index at 5–6. The justifications provided for the two are nearly the same: "The material withheld is pre-decisional deliberative information between the USCIS Office of the director and USCIS office of public affairs staff employees who are working on developing," for the first document, "a media response inquiry about the proposed USCIS pilot program," and for the second document, "talking points for the Director's upcoming visit to the Los Angeles Asylum Field office to talk

about the pilot program." *Id.*  The remainder of the supplemental *Vaughn* index's "justification" section contains boilerplate about harms caused by disclosure of deliberative material.  *See id.*

Defendants make the same arguments as above for the other USCIS documents.  *See* Defs.' Mem. at 15; Defs.' Reply & Opp'n at 5.  Plaintiffs argue that Defendants have not established whether these documents "are predecisional or merely explain a program that was already up and running."  Pls.' Opp'n & Mem. at 19.  Defendants' description of this document and its role at USCIS is insufficient to justify withholding under Exemption 5.  As discussed above, drafts are not per se predecisional or deliberative.  Here, the documents are predecisional in the sense that they were building towards final versions—a final response to the media inquiry and final talking points—but it is possible under Defendants' explanations that these documents "embody . . . a policy that the agency adopt[ed]."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 362 (quoting *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 783).  "[A] draft that was predecisional and deliberative when prepared may 'lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.'"  *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 376 F. Supp. 3d 47, 69 (D.D.C. 2019) (quoting *Arthur Andersen & Co.*, 679 F.2d at 257–58).  Defendants would need to elaborate on that issue to show that these were predecisional documents.  *See id.* at 70 ("The agency's burden is to establish that documents do not constitute the working law." (cleaned up)).

Although Plaintiffs do not explicitly challenge whether these documents are deliberative, they do question whether the documents "merely explain a program that was already up and running."  Pls.' Opp'n & Mem. at 19.  They are correct that the supplemental *Vaughn* index does not foreclose that possibility.  If these documents merely describe the pilot program, they would "not call for judgment or the candid exchange of ideas."  *Reps. Comm. for Freedom of the Press*,

3 F.4th at 366.  Alternatively, as explained above regarding the facts and stats document, "an agency's consideration of what information to present to external parties and how to present it is a decision in itself, distinct from the underlying policy decision that is the subject of any anticipated communication." *Ecological Rts. Found.*, 2021 WL 535725, at *15.  Defendants may believe that these documents reflect such consideration about what to present externally, as opposed to reflecting deliberation on the policies themselves.  *See, e.g.*, USCIS Suppl. *Vaughn* Index at 5 (referring to "employees who are working on developing a media response inquiry about the proposed USCIS pilot program").  But Defendants have not been perfectly clear on this front.  *See, e.g.*, Defs.' Reply & Opp'n at 5 (arguing that the relevant deliberative process is "USCIS' decision-making on the conduct of credible fear interviews" and emphasizing that the documents "relate to a *pilot* program").  Either way, Defendants must more clearly "show (1) 'what deliberative process is involved,' and (2) 'the role played by the documents in issue in the course of that process,'" and "should also explain (3) the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document,' and (4) the 'relative positions in the agency's chain of command occupied by the document's author and recipient.'"  *Jud. Watch, Inc.*, 20 F.4th at 55 (quoting *Senate of the Com. of P.R. ex rel. Judiciary Comm.*, 823 F.2d at 585–86).  Therefore, Defendants have not demonstrated that these documents are deliberative.

## 2.  Harm

The parties dispute whether Defendants have sufficiently demonstrated that disclosure of the above documents withheld under Exemption 5 would cause reasonably foreseeable harm.  As explained below, the Court holds that Defendants have not made such a demonstration.

"Under the FOIA Improvement Act of 2016, the government may not withhold even those privileged materials unless it also 'reasonably foresees that disclosure would harm an

interest protected by' the FOIA exemption." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). "[A]n 'inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.'" *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (quoting H.R. Rep. No. 114-391, at 9 (2016)). "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information. Nor may the government meet its burden with generalized assertions." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (cleaned up). The foreseeable harm requirement imposes a "meaningful burden on agencies." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). "While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—'that is, group together like records' and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (quoting *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)). For withholdings based on the deliberative process privilege, it is not enough to explain how disclosure "could" impair internal deliberations; the agency "must concretely explain how disclosure 'would'" impair such deliberations. *Id.* at 369–70. It is insufficient to merely state that disclosure "would jeopardize the free exchange of information between senior leaders within and outside of the agency. *Id.* at 370 (quoting *Rosenberg*, 342 F. Supp. 3d at 79). There must be a context-specific, "focused[,] and concrete demonstration of why disclosure of the particular type of

material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.*

Defendants' opening brief argues merely that disclosing DHS's deliberative process withholdings "would be misleading[] and inhibit the candid discussion of issues between employees," citing only the DHS declaration. Defs.' Mem. at 13–14. Regarding USCIS's deliberative process withholdings, they similarly argue that disclosure "would chill or deter USCIS employees from engaging in the candid and frank discussions that are so important and necessary when employees are working and sharing ideas to put together accurate agency information which will ultimately be provided to the public once that information is final." *Id.* at 15. Defendants' only response to Plaintiffs' characterization of their supposed harms as "boilerplate or nebulous" is to argue that using the same language to describe the harm for each document is understandable because the records all relate to the same issue, and that the harm in the agencies' declarations is not generalized because "the agency assessed the harm document by document, commenting about the foreseeable harm in the respective *Vaughn* indices." Pls.' Opp'n & Mem. at 24–25; Defs.' Reply & Opp'n at 6.

Upon review of the harm described in the agencies' *Vaughn* indices, the Court agrees with Plaintiffs that the descriptions are generalized, vague assertions that do not meet the statutory standard. For example, regarding the DHS issue paper (DHS-001-0973-1739 to -1742), all that the supplemental *Vaughn* index says about harm is that, "[s]ince this is not the final version of the document, disclosure of this information would be misleading, as well as inhibit the candid discussion of issues between employees." 3d Pavlik-Keenan Decl. at 8. The same justification is given for the other DHS documents at issue, with the "CBP meeting mk edits Clean v1.1" document's withholding also being justified because "[r]elease of these topics of

discussion would disclose deliberations concerning sensitive agency priorities." *Id.* at 8–9, 11.

The supplemental DHS declaration itself is no more specific, referencing "injury to the quality of

future decision-making" and a "chilling effect . . . likely inhibiting future communications." 3d

Pavlik-Keenan Decl. ¶ 5.  These are "a series of boilerplate and generic assertions that release of

any deliberative material would necessarily chill internal discussions." *Reps. Comm. for

Freedom of the Press*, 3 F.4th at 370.  They do not "contain[] thoroughgoing . . . explanation as

to the importance and deliberative value of the specific information in those records in the

particular decisional context in which they arose, as well as the precise damage to the relevant

agency operations that would result from their release." *Id.* at 371.

The harm that would supposedly follow disclosure of the USCIS deliberative process

documents is similarly insufficient.  For example, regarding the three documents considered

together about the credible fear pilot program (Bates numbers 3–13), the supplemental *Vaughn*

index states that disclosure "would have a chilling effect on the Agency's ability to fully

consider and evaluate in[] writing the efficacy and development of its programs" by "reveal[ing]

how the CBP employees prioritized different facts, what they considered to be important, and

other considerations in deliberating as to the continuation of the program."  USCIS Suppl.

*Vaughn* Index at 3.  This is close to arguing that any material covered by the deliberative process

privilege also meets the foreseeable harm standard.  But the foreseeable harm requirement

imposes a "meaningful burden on agencies." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at

106.  Additionally, as explained above, Defendants have not shown that disclosure would in fact

reveal deliberative material, making it difficult to see "the particular sensitivity of the types of

information at issue or the role that they play in the relevant agency decisional processes (and,

therefore, whether and how their release would harm similar deliberations in the future)." *Reps.*

*Comm. for Freedom of the Press*, 3 F.4th at 372.  The other USCIS deliberative process documents fare no better.  Regarding the "facts and stats" document (Bates numbers 1–2), the supplemental *Vaughn* index recites several harm justifications: (1) impairing open discussions; (2) premature disclosure of proposed policies; and (3) public confusion from releasing rationales not ultimately used.  USCIS Suppl. *Vaughn* Index at 2–3.  But none of these explain "the importance and deliberative value of the specific information in those records in the particular decisional context in which they arose, as well as the precise damage to the relevant agency operations that would result from their release."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 371.  The same justifications are given for the draft response to a media inquiry and draft talking points (Bates numbers 15–22, 26–27).  USCIS Suppl. *Vaughn* Index at 5–6.  As an obvious example, if the draft response to the media inquiry or talking points are nearly identical to the final versions, identifying the precise harm that disclosure would cause could be extremely difficult.  And, like the three documents considered together about the credible fear pilot program, these other documents also have not been shown to be deliberative, as explained above, making it harder to see foreseeable harm from their disclosure.

### 3.  Segregability

In their combined opposition and cross-motion, Plaintiffs challenge only the Exemption 5 withholdings on segregability grounds.  *See* Pls.' Opp'n & Mem. at 25–26 (challenging segregability only under Exemption 5 subheading).  "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  "To meet its burden on segregability, a government agency must usually submit a sufficiently detailed *Vaughn* index for each document and an affidavit or declaration stating that it has released all segregable material."  *DBW Partners, LLC v. U.S.*

*Postal Serv.*, No. 18-cv-3127, 2019 WL 5549623, at *8 (D.D.C. Oct. 28, 2019); *see also Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("The combination of the *Vaughn* index and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated.").  "There is no strict level of detail that an agency must provide when explaining its segregability review, so long as the explanation provided is 'sufficient to explain the reasons for [the agency's] withholding and segregation decisions.'" *DBW Partners, LLC v. U.S. Postal Serv.*, No. 18-cv-3127, 2020 WL 2064082, at *7 (D.D.C. Apr. 28, 2020) (quoting *Khine v. Dep't of Homeland Sec.*, 943 F.3d 959, 967 (D.C. Cir. 2019)).

Here, Defendants are already required to supplement their *Vaughn* indices with further detail to justify their Exemption 5 withholdings or release the disputed records.  "As the agenc[ies] will have another opportunity to supplement [their] declarations as to Exemption 5, the Court need not address the issue of whether further segregation of the redacted information from information that may be disclosed is possible." *Jud. Watch, Inc.*, 375 F. Supp. 3d at 101. However, it is worth noting that, as Plaintiffs point out, Defendants' own descriptions of some of their documents suggest that they contain nontrivial amounts of factual information.  *See, e.g.*, Pls.' Opp'n & Mem. at 26 (noting that Defendants describe one document as containing "[i]nformation about how many CBP employees will receive training and descriptions about the training CBP officers will receive"); Pls.' Reply at 14 (noting document described by Defendants as containing "statistical information" that is "inextricably intertwined with deliberative and predecisional information").  Defendants must carefully analyze whether non-exempt information can be disclosed from any documents that they continue to argue contain exempt material.

\*              \*              \*

To encourage the speedy resolution of these questions, the Court orders Defendants to produce the Exemption 5 documents for *in camera* inspection.  There are a relatively small number of documents at issue here, and "*in camera* inspection may be particularly appropriate when," among other things, "the number of withheld documents is relatively small."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 442 F. Supp. 3d 37, 47 (D.D.C. 2020) (quoting *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998)).  Similarly, given the relatively small number of documents that remain at issue, the Court expects thorough explanations justifying the withholding of, and the expected harms disclosure would cause for, each document separately.

### C.  Exemption 6

The last dispute between the parties is the propriety of "USCIS' withholding of the names of CBP officers in an email from Rhonda Roberts, dated July 23, 2019," under either Exemption 6 or 7(C).  Pls.' Opp'n & Mem. at 11; *see id.* at 27–32; Winger Decl. Ex. D, ECF No. 29-5 (email in question with redactions).  The parties do not focus on the details of this particular document, instead focusing on the general propriety of withholding the names of CBP officers who participated in the credible fear program.  For the reasons below, the Court holds that the redactions are not justified under Exemption 6.  Defendants' motion is therefore denied on this ground and Plaintiffs' motion is granted on this ground.  Defendants are ordered to produce the unredacted document.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  When evaluating withholdings under Exemption 6, there is a "presumption in favor of disclosure [that] is as strong as can be found anywhere in the Act."  *Tokar*, 304 F. Supp. 3d at

96 (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008)).

"The Supreme Court has read Exemption 6 broadly, concluding the propriety of an agency's

decision to withhold information does not 'turn upon the label of the file which contains the

damaging information.'" *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir.

2006) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601 (1982)).

"To apply [E]xemption 6, a court must first determine whether disclosure would

compromise a substantial, as opposed to a *de minimis*, privacy interest.  If a substantial privacy

interest is at stake, then the court must balance the individual's right of privacy against the public

interest in disclosure." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015)

(internal quotation marks and citations omitted).  "The threshold requirement of a substantial

privacy interest 'is not very demanding,'" and the D.C. Circuit has consistently found the

threshold met by "the privacy interest in an individual's name and address." *Niskanen Ctr. v.

FERC*, 20 F.4th 787, 791 (D.C. Cir. 2021) (quoting *Multi Ag Media LLC*, 515 F.3d at 1230).

The D.C. Circuit has also "found a significant privacy interest whenever the information sought

was of a type that might invite unwanted intrusions, even absent evidence that such intrusions

had occurred in the past." *Id.*

The relevant public interest is that of "the incremental value of the specific information

being withheld." *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003).  The only

public interests relevant to the Exemption 6 analysis are those that "contribut[e] significantly to

public understanding *of the operations or activities of the government*." *U.S. Dep't of Def. v.

Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994) (internal citation and quotation marks omitted).

"Once disclosed to a requester, records are publicly available, and so the court must consider the

public interest and privacy ramifications of disclosure to the public at large." *Niskanen Ctr.*, 20

F.4th at 791.  "[I]nformation about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct" is not the type of information to which FOIA permits access.  *U.S. Dep't of Def.*, 510 U.S. at 496.

The first question is whether this document is a personnel file, medical file, or similar file.  *See* 5 U.S.C. § 552(b)(6).  Given the Supreme Court's guidance to read "similar files" broadly, this document meets the requirement.  Plaintiffs' citations to the contrary are not convincing in that they concern documents less similar to personnel or medical files.  *See Aguirre v. SEC*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008) (holding that emails discussing SEC official's resignation and offering congratulations are not "similar files" because they "are not personal in nature," but also holding that a "resignation processing form" is a "similar file[]" because it is "more personal in nature"); *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) (holding that Justice Department paralegals' "names and work telephone numbers" were not similar to personnel or medical files, while also noting that "their names and work telephone numbers are already publicly available").  Here, in contrast, the CBP officers' names are used in connection with their upcoming job duties, making this document similar to a personnel file.

Next is whether there is "a substantial, as opposed to a *de minimis*, privacy interest." *Prison Legal News*, 787 F.3d at 1147.  Although this standard "is not very demanding," *Niskanen Ctr.*, 20 F.4th at 791 (quotation omitted), it is not met here.  "Courts in this district have reached different conclusions regarding the magnitude of the privacy interest lower-level government employees have in complete anonymity."  *Tokar*, 304 F. Supp. 3d at 101.  Here, all that the redacted information would reveal is the CBP officers' names and that they participated in the credible fear program.  Given that, as Plaintiffs point out, Defendants did not redact

"names *and email addresses* for approximately thirty USCIS asylum officers," Pls.' Opp'n &
Mem. at 28 (emphasis added), who, based on the document, appear to have responded to a
"request to supervise the USBP agents participating in the CF for USPB training pilot," Winger
Decl. Ex. D, and therefore would also be involved in the program, any privacy interest related to
being associated with performing this asylum function appears to be *de minimis*.  Although
Plaintiffs' opening brief only raised this comparison with the USCIS asylum officers' names and
email addresses in the context of whether the document was a "similar file" or "compiled for law
enforcement purposes," Pls.' Opp'n & Mem. at 28, 29 n.6, it is also relevant to whether there is a
privacy interest, and Defendants did not respond to the comparison in their reply.

        The only privacy interest articulated in Defendants' opening brief beyond generic
allusions to "invasion of the employee's personal privacy" is the potential exposure "to physical
harm."  Defs.' Mem. at 21.  But no detail is provided in the brief to support this fear.  The
declaration cited to support this fear merely states that "[t]he release of such information could
subject those employees to reasonably foreseeable harms in the form of harassment as well as
unwanted contact by the media and other[s]."  2d Pavlik-Keenan Decl. ¶ 46.  More evidence than
a bare assertion would be required to show a sufficient privacy interest.  *See, e.g.*, *Jud. Watch,
Inc.*, 449 F.3d at 153 (finding "abortion-related violence [to be] a privacy interest for both the
names and addresses of persons and businesses associated with mifepristone" in light of
affidavits providing "evidence of abortion clinic bombings" and descriptions of "websites that
encourage readers to look for mifepristone's manufacturing locations and then kill or kidnap
employees").  And, again, Defendants made no effort to explain why CBP officers performing
this function would be more exposed to harm or harassment than their USCIS counterparts.

In reply, Defendants merely state that "CBP officers or agents have a legitimate privacy interest in their identity," citing two out-of-circuit cases in support of withholding CBP employee names.  Defs.' Reply & Opp'n at 8.  The first cited case contains no analysis on this issue, merely citing an earlier opinion.  *Am. C.L. Union of San Diego & Imperial Cntys. v. U.S. Dep't of Homeland Sec.*, No. 815CV00229JLSRNB, 2018 WL 6003545, at *3 (C.D. Cal. Apr. 19, 2018).  The earlier opinion held that, "[b]ecause the records in question involve allegations of unconstitutional or criminal activity by lower to middle-level federal employees, much of which has not been proven or publicly charged, the privacy interests at stake here are substantial."  *Am. C.L. Union of San Diego & Imperial Cntys. v. U.S. Dep't of Homeland Sec.*, No. 815CV00229JLSRNB, 2017 WL 9500949, at *16 (C.D. Cal. Nov. 6, 2017).  Here, there would be no similar release of unsubstantiated allegations.  The second cited case concerned "terminal identifiers and employee names and phone numbers," not just names, and does not explain in much detail why a substantial privacy interest was found.  *Paco v. U.S. Customs & Border Prot.*, No. CV 14-5017 (MLC), 2016 WL 344522, at *5 (D.N.J. Jan. 27, 2016).

Even if there were a substantial privacy interest, these redactions would fail the subsequent balancing test.  "If a substantial privacy interest is at stake, then the court must balance the individual's right of privacy against the public interest in disclosure" to determine if there would be "a clearly unwarranted invasion of personal privacy."  *Prison Legal News*, 787 F.3d at 1147 (internal quotation marks omitted); 5 U.S.C. § 552(b)(6).  Public interest in disclosure comes from the value that the specific information released would provide in aiding the public's understanding of government operations.  *See Schrecker*, 349 F.3d at 661; *U.S. Dep't of Def.*, 510 U.S. at 495.

Plaintiffs have put forth a public interest that significantly outweighs any potential privacy interest in this case.  Namely, disclosure of CBP officers' names would show "whether the officer who conducted a credible fear interview was a Border Patrol officer" such that asylum seekers can explore legal relief and the public can "understand the full scope of who was injured by the program."  Pls.' Opp'n & Mem. at 30–31.  Defendants themselves are responsible for the outstanding public interest in this information; they do not dispute that "Border Patrol agents were instructed not to inform the individuals they were interviewing, or their attorneys, that they were Border Patrol agents" and that "[w]hen Border Patrol agents were directly asked whether they were Border Patrol agents they would only confirm that they were working as an asylum officer."  Defs.' SUMF Resp. ¶ 3.  In other words, Defendants prevented asylum seekers from learning whether their interviewers were USCIS or CBP officers.  *See* Pls.' Opp'n & Mem. at 30.  This is not a case of a poorly reasoned justification for disclosing officers' names.  Here, the names appear to be necessary for the public to understand the government's operations.  *See U.S. Dep't of Def.*, 510 U.S. at 495.

Defendants only make two arguments in response (combining their balancing-test arguments for Exemptions 6 and 7(C)).  First, they argue that there is no evidence that specific CBP officers engaged in misconduct.  Defs.' Reply & Opp'n at 8.  Plaintiffs contest this point, *see* Pls.' Reply at 10, but, regardless, there is a public interest beyond learning the misconduct of specific officers.  In fact, the quote cited for support by Defendants states that "the justification most likely to satisfy Exemption 7(C)'s public interest requirement is that the information is necessary to show the investigative *agency* or other responsible officials acted negligently or *otherwise improperly* in the performance of their duties."  *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 173 (2004) (emphases added).  Here, disclosure would aid public

understanding of whether the agency acted improperly and the extent of any harm caused.

Second, Defendants argue that releasing the names of the CBP officers would not bear on

"whether the pilot program was inconsistent with the Administrative Procedure Act or the

Immigration and Nationality Act," in part because those officers "played no role in the crafting

of the pilot program."  Defs.' Reply & Opp'n at 8.  The latter is not relevant; as explained above,

there is a public interest in understanding how the government operated here beyond how the

program was created.  Regarding the former, Defendants do not dispute Plaintiffs' argument that

the public interest is served by giving asylum seekers the information they need to try and

challenge negative determinations.  *See* Pls.' Opp'n & Mem. at 30–31.  It is therefore not

dispositive whether revealing the names would show whether the program violated certain

statutes.  *See Am. C.L. Union v. U.S. Dep't of Just.*, 655 F.3d 1, 14 (D.C. Cir. 2011) ("[P]laintiffs

are not (or at least not only) seeking to show that the government's tracking policy is legally

improper, but rather to show what that policy is and how effective or intrusive it is."), *quoted in*

Pls.' Opp'n & Mem. at 31.  Tellingly, Defendants give no indication that the public, including

asylum seekers, could learn this same information elsewhere without disclosing the names.

### D.  Exemption 7(C)

It is not necessary to discuss Exemption 7(C) in depth because, despite the easier-to-meet

standard compared to Exemption 6, Defendants' redactions do not meet Exemption 7(C).

Exemption 7(C) allows an agency to withhold "records or information compiled for law

enforcement purposes, but only to the extent that the production of such law enforcement records

or information . . . could reasonably be expected to constitute an unwarranted invasion of

personal privacy."  5 U.S.C. § 552(b)(7)(C).  "Exemption 7(C) has less stringent requirements

for withholding than Exemption 6, because in order to properly invoke it an agency need only

show that the release of the information 'could reasonably be expected' to be an 'unwarranted' invasion of personal privacy, as opposed to a 'clearly unwarranted' invasion of personal privacy." *Tokar*, 304 F. Supp. 3d at 99.  "The courts have construed this provision as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure." *Nation Mag., Wash. Bureau*, 71 F.3d at 893.  "[T]raditionally, the privacy interests at stake in an Exemption 7(C) analysis are those resulting from the stigma of being associated with a criminal investigation." *Tokar*, 304 F. Supp. 3d at 99.

Exemption 7(C) first requires that the record have been "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  Plaintiffs argue that this record was not created for law enforcement purposes because the CBP agents "were performing duties that encompass the adjudication of asylum claims, a humanitarian form of immigration relief, which is *not* a law enforcement function."  Pls.' Opp'n & Mem. at 29 n.6.  They cite Judge Leon's recent opinion which explains that DHS regulations and USCIS guidelines require the asylum interviews to be nonadversarial.  *See id.* (citing *A.B.-B.*, 2020 WL 5107548, at *7).  Additionally, the Memorandum of Agreement between CBP and USCIS requires CBP to "[e]nsure that [Border Patrol Agents] and [Supervisory Border Patrol Agents] are not exercising their law enforcement officer duties while on the [credible fear task force] assignment."  Howard Suppl. Decl. Ex. A ¶ 4(B)(iv).  Though neither party addresses this specific language in relation to this question.[3] Defendants cite an earlier case for the proposition that USCIS acts as a law enforcement agency when it adjudicates requests for immigration benefits.  *See* Defs.' Mem. at 19; *Gosen v. U.S. Citizenship & Immigr. Servs.*, 75 F. Supp. 3d 279, 288–89 (D.D.C. 2014) (explaining that "courts

---

[3] Plaintiffs quote this language only to counter the argument that CBP played only a limited role in the pilot program.  *See* Pls.' Reply at 3.

regularly find Exemption 7 applicable to USCIS documents" and implying that documents involved in the enforcement of statutes or regulations within USCIS's authority and compiled for adjudicative or enforcement purposes meet the "law enforcement purposes" requirement).  But *Gosen*'s analysis of this issue is relatively brief and responds to the broader argument that a "law enforcement mandate" was needed to meet the "law enforcement purposes" requirement.  *See* 75 F. Supp. 3d at 288–89.  Overall, it remains unclear whether this document was compiled for law enforcement purposes.

However, even assuming that the document at issue was compiled for law enforcement purposes, it still fails the next requirement—the balancing test.  For the same reasons given above for Exemption 6, any possible privacy interest at stake here is outweighed by the public interest in disclosure such that it could not "reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 28) is **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' motion for summary judgment (ECF No. 29) is **GRANTED IN PART AND DENIED IN PART**.  Specifically, Defendants' motion is **GRANTED** to the extent that it is unopposed, **DENIED** regarding CBP's search and redaction of CBP officer names in one document, and **DENIED WITHOUT PREJUDICE** regarding the Exemption 5 withholdings.  Plaintiffs' motion is **GRANTED** regarding CBP's search and redaction of CBP officer names in one document and **DENIED WITHOUT PREJUDICE** regarding the Exemption 5 withholdings.  Defendants are **ORDERED** to conduct a search reasonably calculated to uncover all relevant documents from the expedited requests.  Defendants are also **ORDERED** to either supplement their *Vaughn* indices to justify their

Exemption 5 withholdings or release the documents.  Defendants are also **ORDERED** to produce for *in camera* inspection the disputed documents that they continue to withhold under Exemption 5.  The parties are **ORDERED** to submit a proposed schedule for further proceedings within two weeks of the issuance of this opinion.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 11, 2022                                   RUDOLPH CONTRERAS
                                                        United States District Judge